## A97A1571, A97A1572. MUNICIPAL ELECTRIC AUTHORITY OF GEORGIA v. CITY OF CALHOUN; and vice versa.
### (489 SE2d 599)

JOHNSON, Judge.

The Municipal Electric Authority of Georgia ("MEAG") is a statutorily created non-profit corporation which acquires electric power supply resources and provides wholesale electric power and energy to participating Georgia political subdivisions. The city of Calhoun ("Calhoun"), a participant in the program, sued MEAG claiming that it had been overcharged for certain bulk power and energy in violation of various provisions contained in a series of contracts between the parties. Following a two-week bench trial, the trial court entered a very thorough and detailed order entering judgment in favor of Calhoun and awarding damages in the amount of $629,070, representing overpayments made in 1993 and 1994. MEAG appeals in Case No. A97A1571, asserting the trial court misinterpreted one key provision of the contracts. In Case No. A97A1572, Calhoun appeals from the trial court's exclusion of its claim for overpayments made in 1992.

*Case No. A97A1571*

A brief review of the various contracts between these parties is necessary to provide a frame of reference for this appeal. The initial contract between MEAG and the participants in the program, including Calhoun, was dated October 1, 1975. Known as the "Project One Power Sales Contract," it provided for the sale of electric capacity and electric energy from Plant Hatch and Plant Vogtle. Under the terms of this contract, a participant agreed to receive and pay for an entitlement share of the output of those plants. Calhoun's share was 2.256 percent. Under § 312 of the Power Sales Contract, if a participant determined that the output and services of the generating facilities exceeded its requirements, MEAG could sell or transfer any or all of the excess output to any other participant in the program who agreed to take the excess. If none of the participants agreed to accept the excess, MEAG could dispose of the excess to other utility companies.

By 1986 it became clear that the demand for electric power by the participants in the program had been overestimated. The parties entered into an Agreement of Understanding For Sale and Purchase of Excess Capacity and Energy, known as the "1987 Agreement." The purpose of this agreement was to "implement Section 312 of the Project One Power Sales Contract." In paragraph 1 of the 1987 Agreement, the parties agreed that MEAG was authorized to determine the extent to which a participant's power allotment exceeded its requirements. This determination "shall be made generally in accordance with the methodology described in Exhibit 'A' hereto." Exhibit

"A" consists of two models which illustrate a system of calculating a participant's capacity requirements. Paragraph 3 of the 1987 Agreement sets the price participants are to pay for excess energy as "the lesser of the Blend Capacity Rate or the actual generation fixed cost per kW."

In 1991, MEAG became concerned that the "blend capacity rate" charged for excess energy had increased to a level which prompted participants to consider purchasing their own diesel generators to meet their power needs for peak power rather than relying on MEAG. As a result, MEAG proposed to set the excess capacity price using a "rule of thumb" basis. During discussions in 1991, Calhoun objected to the new rates, and a compromise rate for the 1992 budget was reached. In 1993 and 1994 Calhoun paid the new rate under protest asserting that the budgets with rates set at a level other than the blend capacity rate or actual generation rate violated § 312 of the Project One Power Sales Contract and the 1987 Agreement.

MEAG contends that paragraph 7 of the 1987 Agreement, which provides that "[t]he Participant and the Authority agree that this methodology shall be used for the sale and purchase of excess capacity and energy until such time as changed upon thirty days prior written notice from the Authority to the Participant," allows MEAG to unilaterally change any term of the 1987 Agreement, including the price, by giving the participants 30 days notice. Calhoun and the trial court interpret the term "methodology" as being a reference to the system by which MEAG determines the quantity of excess capacity of the various participants, not to the rate schedule.

1. In three related enumerations of error, MEAG contends the trial court erred in holding that the methodology referred to in paragraph 7 is limited to the system for determining excess capacity. We reject MEAG's arguments and affirm the trial court for two principal reasons.

(a) "There are three steps in the process of contract construction. The trial court must first decide whether the contract language is ambiguous; if it is ambiguous, the trial court must then apply the applicable rules of construction (OCGA § 13-2-2); if after doing so the trial court determines that an ambiguity still remains, [the trier of fact] must then resolve the ambiguity." (Citations and punctuation omitted.) *Karlan, Inc. v. King*, 202 Ga. App. 713, 715 (1) (415 SE2d 319) (1992). See *Cincinnati Ins. Co. v. Page*, 188 Ga. App. 876, 878 (374 SE2d 768) (1988). It appears that after application of the rules of construction, the ambiguity of the meaning of the word "methodology" in paragraph 7 of the 1987 Agreement was the only issue remaining for resolution by the finder of fact in the trial of the case. In resolving such an ambiguity, the finder of fact may consider parol or other extrinsic evidence to determine the intent of the parties. See

*American Communities Corp. v. RIHT Mtg. Corp.*, 195 Ga. App. 101, 102 (1) (392 SE2d 318) (1990). The record in this case exceeds 8,000 pages. Numerous witnesses testified to the intent of the parties in 1986 when the agreement was drafted, but as the trial court noted, "[t]en years separate the testimony and the actual events. The Court gives weight to the contemporaneous documents." Particularly, it appears, the trial court relied on a letter from MEAG's general counsel dated October 23, 1986, to the participants which explained that a "method" had been devised to determine the amount of excess capacity which participants may have. The price for such excess, the letter indicated "will be the MEAG blend capacity rate, and the excess energy will be priced at the lowest of these costs as set forth in the agreement." The findings of the trial court sitting without a jury shall not be set aside unless clearly erroneous. OCGA § 9-11-52 (a); see generally *Southern Environmental &c. v. Rosebud Landscape &c.*, 196 Ga. App. 392 (395 SE2d 913) (1990). Because there was a factual basis supporting the finder of fact's determination that paragraph 7 of the 1987 Agreement only permits a unilateral change in the methodology used for determining excess capacity, that finding is not clearly erroneous and will not be disturbed.

(b) We agree with the trial court that if paragraph 7 were to be read as suggested by MEAG, that is, if any term of the contract is amendable at the will of MEAG, the entire contract would be void for vagueness because there could be no assent of the parties to the terms of the contract. See OCGA § 13-1-1; *Cherokee Falls Investments v. Smith*, 213 Ga. App. 603, 605 (1) (445 SE2d 572) (1994). Georgia courts are reluctant to hold a contract void for vagueness. See *Smith v. Bd. of Commrs. &c. of Hall County*, 244 Ga. 133, 143-144 (5) (259 SE2d 74) (1979). Here, as different power sources come on or off line, as the various participants in the program have fluctuations in their populations or energy needs, or as the ability to create more efficient models of energy usage develop, it is logical to expect that calculations regarding excess capacity may be subject to differing methodologies. This is not so with the price, which was negotiated and agreed to by the parties.

### Case No. A97A1572

2. The trial court found that by failing to follow the procedures set out in § 210 of the Project One Sales Contract in 1992, after a compromise regarding the budget had been reached, Calhoun's payments were voluntary and recovery is barred under OCGA § 13-1-13. Alternatively, the trial court found a common law waiver of Calhoun's right to recover 1992 damages by virtue of Calhoun's failure to comply with the provisions of § 210 of the Project One Sales Contract.

Calhoun claims these findings are erroneous.

Section 210 of the Project One Power Sales Contract reads: "In the event the monthly Billing Statement is in dispute, [MEAG] will give consideration to such dispute and will advise the Participant with regard to [MEAG's] position relative thereto within thirty days following written notification by the Participant of such dispute." Calhoun takes the position that § 210 was intended to provide a mechanism for resolution of computation errors in the monthly billing statements and not as a means for addressing broader disputes such as those concerning the annual budget. Calhoun suggests that this provision does not place any affirmative burden on participants to pay disputed bills under written protest but places a burden on MEAG to respond to a dispute of which it has received written notification within 30 days.

"It is axiomatic that a contract should be construed by the court where the language is undisputed. . . . If the contract does not require disentanglement of the language by a [finder of fact], . . . it remains the duty of the trial court to look to the language of the contract with a view to effectuating the intent of the parties." (Citations and punctuation omitted.) *Candler v. Davis & Upchurch*, 204 Ga. App. 167, 168 (2) (419 SE2d 69) (1992). Calhoun points out that no testimony or evidence was presented at trial concerning the parties' intent with respect to that provision. Calhoun, of course, had the burden of proof at trial. By failing to introduce any evidence in support of its position regarding the parties' intent as to § 210, Calhoun acquiesced in that issue being decided as a matter of law. As the trial court pointed out in its order, after reaching a compromise on the 1992 budget, Calhoun paid its monthly billings without objection. In 1993 and 1994, however, Calhoun did object to monthly billings in accordance with the contractual provisions allowing disputed payments to be made under protest. The trial court interpreted § 210 as placing an affirmative obligation on the participants to protest monthly billings in writing and concluded that Calhoun's failure to protest the monthly billings in 1992 constituted a waiver. "The trial court's findings will not be set aside unless they are clearly erroneous." (Citations and punctuation omitted.) Id. The trial court's reading of § 210 was not clearly erroneous and will not be disturbed.

3. We need not reach Calhoun's assertion that the trial court erred in finding that the 1992 payments constitute unrecoverable voluntary payments under OCGA § 13-1-13 because a judgment which is right for any reason must be affirmed. See *Precise v. City of Rossville*, 261 Ga. 210, 211 (3) (403 SE2d 47) (1991).

*Judgments affirmed. Pope, P. J., and Blackburn, J., concur.*

575

DECIDED JULY 24, 1997.

*Alston & Bird, L. Clifford Adams, Jr., Peter M. Degnan,* for appellant.
*Erck, Dever & Merlin, Hayes M. Dever, Lawrence M. Merlin, Douglas M. Robinson, Judith W. Bowman,* for appellee.