## A98A1091. EMPIRE DISTRIBUTORS, INC. v. GEORGE L. SMITH II GEORGIA WORLD CONGRESS CENTER AUTHORITY et al.

(509 SE2d 650)

SMITH, Judge.

This litigation arose from a dispute over the sale of tickets for the 1996 Centennial Olympic Games in Atlanta. Empire Distributors, Inc. ("Empire") sued the George L. Smith II Georgia World Congress Center Authority ("GWCC") and its general manager Khalil Johnson under 42 USC § 1983 and state constitutional takings law, alleging that they wrongfully forbade Empire's use of tickets to Olympic events in the Georgia Dome that Empire had purchased from the Atlanta Committee for the Olympic Games ("ACOG").[1] The trial court granted GWCC's motion for summary judgment, holding that Empire had no property interest in the tickets. Because the trial court erred in its construction of the relevant contract documents, and because factual issues remain for jury resolution, we reverse.

Summary judgment is proper only when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. OCGA § 9-11-56 (c). Applying the proper de novo standard of review to an appeal from a grant of summary judgment, we must view the evidence, as well as all reasonable conclusions and inferences drawn from it, in the light most favorable to the respondent. *Matjoulis v. Integon Gen. Ins. Corp.*, 226 Ga. App. 459 (1) (486 SE2d 684) (1997).

Construed in this manner, the record shows that in 1990, Empire and GWCC entered into a ten-year lease agreement for a suite at the Georgia Dome. In November 1994, during Empire's lease, GWCC sent to all suite holders, including Empire, a letter offering the opportunity to purchase tickets to Olympic events at the Georgia Dome "well in advance of the general public." This letter stated that the offer was made on behalf of ACOG and instructed purchasers to deal directly with ACOG. In December 1994, Empire purchased approximately 1,200 tickets at a cost of $91,839 and paid that sum in full to ACOG before the deadline of July 31, 1995.

On August 1, 1994, before Empire's purchase of the tickets, GWCC and ACOG executed a license agreement in contemplation of the use of the Georgia Dome for Olympic events. This agreement gave ACOG "exclusive use" of the Georgia Dome from June 1, 1996 through August 4, 1996. It provided that ACOG "shall have the exclusive rights in accordance with this agreement . . . to control ticketing, admission and seating for all events within the dome," including but not limited to "restrictions on admission of ticket holders

---

[1] Empire also sued List Holders, Inc., not a party to this appeal, for breach of contract.

. . . distribution of tickets . . . ticket-taking . . . [and] retention of redeemed tickets." It also provided that ACOG "shall have the exclusive right to sell or otherwise distribute tickets to events." The agreement further required ACOG to offer suite licensees tickets both in their own or another suite and in the Dome's general seating or "stadium area." A similarly worded provision required ACOG to offer tickets to holders of a "club seat license."

Early in 1994, Empire's senior vice president informed Dome officials that Empire was dissatisfied with the suite license because of ticket allocation problems and other difficulties, and he stated Empire's intention to find another party to take over the remainder of its lease. In October 1995, Empire reached an agreement with List Holders, Inc. ("LHI") to assume the remainder of its lease. GWCC, Empire, and LHI executed a document styled "Consent to Full Assignment and Cancellation of Executive Suite License Agreement [Non-Participation Agreement] Release of Licensee" in which Empire agreed to transfer "all of [its] right, title and interest in the referenced existing license agreement" to LHI. This agreement also provided that it "shall operate as a cancellation of the existing license agreement and a mutual release by the authority and the licensee [Empire] and assignee of their respective rights and obligations thereunder."

In a separate agreement, Empire offered virtually all of its previously purchased Olympic tickets to LHI upon payment of the purchase price to Empire, with the understanding that Empire would use the tickets if LHI did not pay for them by a certain date. On October 23, 1995, Empire notified GWCC by letter that it was entering into a separate contract with LHI for the Olympic tickets and would use them if LHI did not purchase them. GWCC's reply letter did not object or respond to this proposal.

LHI failed to make timely payment of its annual license fee on the suite, and on May 8, 1996, GWCC notified LHI that it would be considered in default if it failed to pay within ten days.[2] On or about May 7, 1996, GWCC informed Empire that LHI had not paid its license fee and that Empire would not be allowed to use the Olympic tickets unless it assumed the remainder of LHI's lease and immediately paid the $80,000 license fee. Appellee Johnson candidly acknowledged that it was GWCC's intention to use the Olympic tickets as "a lever, if you will, to assist in our collections."

On July 2, 1996, Empire filed this action, but negotiations and

---

[2] Empire contends that GWCC's declaration of default as to LHI was ineffective for the period of the Olympics, as the initial default letter contained erroneous information and was not corrected until after GWCC used Empire's original security deposit to pay LHI's balance for the fiscal year in which the Olympics took place. But we do not reach this issue.

correspondence continued between the parties for some time. ACOG for its part insisted to Empire that ACOG had exclusive control over Olympic tickets and that Empire could use them. ACOG also informed GWCC that failure to admit ticket holders would constitute a breach of ACOG's agreement with GWCC. ACOG refused to repurchase the tickets from Empire or exchange them for other tickets, and GWCC refused to reimburse Empire. But evidence was presented that GWCC, through its counsel, agreed to a refund to an individual who had purchased Olympic tickets under the similar advance sale provisions for club seat licensees.[3]

On July 8, 1996, 11 days before the Olympics began, GWCC offered to allow Empire to use the Olympic tickets if it agreed to a one time "event license" for $5,000 and a release of any claims against GWCC. Empire refused, contending the offer came too late for it to use or distribute approximately 1,200 tickets, which it had planned to give to customers and suppliers in other states and foreign countries. After further discovery, the trial court granted summary judgment to GWCC, and this appeal followed.

To resolve the merits of this appeal, we first must consider the applicable rules of contract construction. "There are three steps in the process of contract construction. The trial court must first decide whether the contract language is ambiguous; if it is ambiguous, the trial court must then apply the applicable rules of construction (OCGA § 13-2-2); if after doing so the trial court determines that an ambiguity still remains, the trier of fact must then resolve the ambiguity." (Citations and punctuation omitted.) *Municipal Elec. Auth. of Ga. v. City of Calhoun*, 227 Ga. App. 571, 572 (1) (a) (489 SE2d 599) (1997). "[A]fter the application of pertinent rules of contract construction to the contract, extrinsic evidence becomes admissible to explain any remaining ambiguity. Moreover, parol evidence is admissible to explain an ambiguity in a written contract, although such evidence is inadmissible to add to, take from, or vary the writing itself." (Citations and punctuation omitted.) *Thomas v. American Global Ins. Co.*, 229 Ga. App. 107, 109 (2) (a) (493 SE2d 12) (1997). Finally, "the cardinal rule of construction is to ascertain the intention of the parties." OCGA § 13-2-3.

Bearing in mind these rules of contract interpretation, we find that the trial court erred in failing to consider all the relevant contracts in the record. The license agreement executed by Empire is identical to that executed by LHI; both appear to have been prepared on a form created by GWCC. Both license agreements provide for the

---

[3] The trial court's assertion that there was no evidence that GWCC consented to this refund is contradicted by this correspondence, particularly the blind postscript directing: "please make sure ACOG refunds the ticket price."

purchase of tickets for "special events," and both explicitly state that the use of suites and purchase of tickets for such special events may be controlled and restricted by "the terms of the authority's agreement with the event sponsor for such special event." GWCC agrees to "endeavor to provide or to require the event sponsor to provide . . . an option to purchase" tickets, but "makes no promise that it will be able to provide all or any of the foregoing options." The license agreements also provide that a ticket is "a contract between licensee and the event sponsor, not the authority." These provisions demand reference to GWCC's special event agreement with ACOG, since the license agreements explicitly refer to such agreements, and the trial court erred in refusing to consider the effect of that agreement on Empire's dispute with GWCC and the construction of its contract.

Reading these interlocking contracts together, as we must, it is apparent that issues remain for jury resolution. The assignment agreement among Empire, LHI, and GWCC, for example, contains significant ambiguity. That agreement states that it "shall operate as a cancellation of the existing license agreement and a mutual release by the authority and the licensee and assignee of their respective rights and obligations thereunder." In the face of the explicit language of the assignment releasing Empire and GWCC from their mutual rights and obligations under the original license agreement, it is by no means clear that Empire became subject to the terms of GWCC's license agreement with LHI. Another, and equally plausible, construction would be that the termination of the license agreement left Empire in its statu quo at that time: in possession of the Olympic tickets that it had purchased from ACOG in accordance with and during the term of its license and which it paid for in full. At a minimum, the fate of the Olympic tickets under the terms of the assignment is ambiguous, and parol evidence such as the correspondence between Empire, GWCC and ACOG is admissible to determine the parties' intent.

It is true that the GWCC license agreement requires the licensee "upon the license expiration date, or upon the earlier termination of the license" to return to GWCC "all keys to the suite or any cabinets or closets therein, and all unexpired tickets and parking passes theretofore issued to licensee." But the assignment, as it explicitly states, cancelled the original license agreement and acted as a mutual release of all the parties' rights and obligations. Empire thereafter was no longer a "licensee"; LHI was the licensee under the agreement in effect at the time. It is therefore a reasonable construction of the license to conclude that the Olympic tickets were never "issued" to LHI, the party obligated under the license agreement at the time of termination.

Moreover, while the trial court found that the term "all

unexpired tickets . . . issued to licensee" included all tickets from whatever source, this is not consistent with the provisions of the license agreement regarding the purchase of tickets by the licensee. The term "issued" is used only for parking passes provided directly by GWCC, and GWCC is only required to "provide" tickets to certain regularly scheduled football games directly to licensees. In contrast, the license agreement gives merely an "option to purchase" tickets to other publicly ticketed events, and tickets to special events are "made available . . . by the event sponsor" and GWCC simply will "endeavor to provide or to require the event sponsor to provide . . . an option to purchase."

Even assuming, therefore, that Empire could still be considered a "licensee" although its license had been cancelled and all obligations released, the return requirement can reasonably be construed as limited to various tangible items, parking passes, and tickets actually issued by GWCC, as opposed to special event tickets issued by an event sponsor. This construction is in accordance both with the express provision in the license agreement that special event tickets are a contract between the licensee and special event sponsor, not GWCC, and with GWCC's agreement granting ACOG exclusive rights to control ticketing, admission, and seating for all Olympic events in the Georgia Dome. At a minimum, the license agreement is ambiguous regarding the scope of the requirement to return "unexpired tickets." Parol evidence such as testimony and correspondence is admissible to ascertain the true intentions of the parties regarding the disposition of the Olympic tickets.

In summary, the trial court erred in failing to consider the effect on the license agreement of the interlocking provisions of the ACOG agreement or the assignment to LHI of Empire's licensing agreement and concurrent release of all obligations under the former agreement. But even reading these contracts together, and applying the rule that any ambiguity will be construed most strongly against the drafter, *Gram Corp. v. Wilkinson*, 210 Ga. App. 680 (1) (437 SE2d 341) (1993), the agreement between the parties regarding Olympic tickets purchased and fully paid for during the pendency of Empire's license agreement remains ambiguous. A jury must consider the circumstances surrounding the transactions in order to determine the scope and effect of the agreements between the parties. "Parol evidence is admissible to explain all ambiguities, the question as to what was intended being an issue of fact for the jury. Even after the introduction of parol evidence, there remains a conflict in the evidence as to the intent of the parties, and this disagreement is an evidentiary, factual matter for resolution by the jury and not a matter of law for determination by the court." (Citations and punctuation omitted.) *Karlan, Inc. v. King*, 202 Ga. App. 713, 715-716 (1) (415

SE2d 319) (1992).

Viewing the evidence with all reasonable conclusions and inferences drawn from it, as we must, in the light most favorable to Empire, there is at least some evidence in the record from which a trier of fact could infer that GWCC granted ACOG exclusive control over the tickets to Olympic events in the Georgia Dome; that Empire purchased Olympic tickets from ACOG in accordance with and during the term of its license, retained the tickets, and informed GWCC of that fact; that GWCC acquiesced in Empire's retention of the tickets; that GWCC directed ACOG to refund the money of at least one similarly situated Olympic ticket holder but refused to assist Empire; and that GWCC intended to use the Olympic tickets as a "lever" to persuade Empire to reassume the lease from LHI. The trial court therefore erred in granting summary judgment in favor of GWCC and Johnson.

*Judgment reversed. Johnson, P. J., and Senior Appellate Judge Harold R. Banke concur.*

DECIDED NOVEMBER 18, 1998 —<br>RECONSIDERATION DENIED DECEMBER 14, 1998 ▮

*Troutman Sanders, Daniel S. Reinhardt, William M. Droze,* for appellant.

*Thurbert E. Baker, Attorney General, Ray O. Lerer, Senior Assistant Attorney General, Harman, Owen, Saunders & Sweeney, Timothy J. Sweeney,* for appellees.