A00A2362. GOLDEN PEANUT COMPANY v. BASS et al.
(547 SE2d 637)

MIKELL, Judge.

Golden Peanut Company ("Golden Peanut") appeals a judgment in favor of Neon Earl Bass, Jr., Dry Branch Farms, Inc., and Varner-Bass Enterprises ("plaintiffs") on a breach of contract claim. Following a two-week trial, the jury returned a large verdict in favor of the plaintiffs. The trial court denied Golden Peanut's motions for directed verdict and judgment notwithstanding the verdict, and this appeal followed. Because the trial court committed harmful error in refusing to give Golden Peanut's requested jury charge on accord and satisfaction, we reverse.

This case involves contracts for the sale of unshelled peanuts. Golden Peanut is a "sheller," and plaintiffs are peanut farmers. It is undisputed that under federal regulations, each farm is assigned a limited quantity of "quota peanuts" that may be sold for domestic consumption. All peanuts produced in excess of the quota are labeled "additional peanuts," which generally must be exported or crushed

---

[21] See id.

for oil. Contracts for the sale of additional peanuts are subject to regulation and must be approved by a federal agency. 7 CFR § 1446.107 (a) (1990).

At issue in this case are contracts for the sale of plaintiffs' 1990 crops to Golden Peanut. Viewed in the light most favorable to upholding the jury's verdict, the evidence adduced at trial demonstrates that Golden Peanut agreed to pay a "floor price" for plaintiffs' quota peanuts and additional peanuts, with the understanding that a final price could be "lock[ed] in" later in the year. Witnesses for both sides testified that a floor price is simply a minimum price. The parties reduced their agreement to writing in April 1990, when they signed fifty-five contracts, one contract for each individual peanut farm. The words "floor price" were typed next to the term "firm price" on each of the form contracts. See *Estate of Sam Farkas, Inc. v. Clark*, 238 Ga. App. 115, 120 (2) (517 SE2d 826) (1999) (terms added to a contract prevail over terms in a pre-printed form). See also OCGA § 13-2-2 (7) ("When a contract is partly printed and partly written, the latter part is entitled to most consideration."). The contracts were approved by the local Agriculture Stabilization & Conservation Service ("ASCS") office in each of the counties where plaintiffs' farms were located.

After the contracts were signed, each party partially performed their contractual obligations. For example, as the peanuts were harvested on each of the plaintiffs' 55 farms, they were delivered to Golden Peanut to be processed for resale. Upon each delivery, Golden Peanut paid the plaintiffs at the following rate: (1) for quota peanuts, the plaintiffs were paid the higher of the agreed-upon floor price of $675 per ton or the market "spot" price for that particular day; and (2) for additional peanuts, they were paid the floor price of $401 or $440 per ton, depending on the type of peanut. The deliveries and payments continued into the fall of 1990. Meanwhile, the parties negotiated regarding the final prices of the quota peanuts and additional peanuts.

The prescribed method for "locking in" the actual price would be slightly different for quota peanuts and for additional peanuts. For quota peanuts, the plaintiffs had the right to designate as the sale price for all deliveries during the crop year Golden Peanut's "spot price" on whatever date the plaintiffs wished to "lock in" a price. The parties anticipated that the "spot prices" would rise as the harvest continued and the effects of the drought were felt. As to additional peanuts, the plaintiffs' evidence was that they could "lock in" a price by reference to the "market price" on the date of their choosing.

The parties were unable to agree on the final prices. In mid-October, after a series of unsuccessful negotiations, Gaylord Coan, the president of Golden Peanut, unilaterally made what he deemed to be a final offer to pay plaintiffs $875 per ton for all quota peanuts

and the previously agreed-upon floor price for additional peanuts ($401 or $440 per ton, depending on the type of peanut). Immediately following Coan's offer, Golden Peanut sent plaintiffs a payment of approximately $900,000 which brought the amount that had previously been paid for quota peanuts to $875 per ton. The payment was accompanied by the "Varner-Bass Settlement Report," which was a spreadsheet showing the calculation of the offered price for the quota peanuts. Plaintiffs accepted and negotiated the payment. Golden Peanut continued to pay plaintiffs $875 per ton for each subsequent delivery of quota peanuts and the floor price of $401 or $440 per ton for additional peanuts. Plaintiffs accepted the payments and never attempted to "lock in" a different price in accordance with the procedure regarding "spot prices," "market prices," and Rotterdam prices, et cetera. It is undisputed that plaintiffs never complained to Golden Peanut about the amount paid for the 1990 crops during the period between November 5, 1990, and the filing of this lawsuit in 1994. The plaintiffs explained that Golden Peanut had prevented them from "locking in" a price by its unilateral actions in October and that Varner-Bass could not sue Golden Peanut in 1990 or 1991 because they were highly leveraged and hence compelled to accept the payments. In this action plaintiffs contend that they accepted the $875 per ton price for quota peanuts and the floor price for additional peanuts merely as partial payment of the total amount due.

Plaintiffs' complaint alleges that Golden Peanut breached the parties' contracts by refusing to allow plaintiffs to lock in a higher market price for peanut crops in 1990 and, as a result, that Golden Peanut grossly underpaid them. After hearing the evidence, the jury returned a verdict in favor of plaintiffs and awarded compensatory damages and interest for the quota peanuts and additional peanuts, as well as attorney fees for Golden Peanut's bad faith.

On appeal, Golden Peanut enumerates two errors with respect to the jury charge given by the court and argues that the court erred in denying its motions for directed verdict and j.n.o.v. Because our decision regarding the jury charge on accord and satisfaction is dispositive of the case, we will address it first.

1. In its answer to the complaint, Golden Peanut raised the affirmative defense of accord and satisfaction. At trial, Golden Peanut requested two pattern jury instructions on the subject, the charges found on page 24 of the Suggested Pattern Jury Instructions, Vol. I: Civil Cases. The trial court gave only one of the two charges requested by Golden Peanut, defendant's request to charge no. 20, which is part A of the pattern charge on accord and satisfaction:

> When a new agreement takes the place of an old one, this ends the old agreement. The legal words for such an end to

an old agreement are accord and satisfaction. It takes place where the parties satisfy one agreement by making and carrying out a new one; where they expressly agree that the new one takes the place of the old; or where there is a new consideration for a new promise in place of the old one.

Despite Golden Peanut's written request, the court declined to give its second requested charge on the subject, defendant's request to charge no. 21, which is part B of the pattern charge:

When a party makes an offer of a certain sum to settle a claim, the amount of which is the subject of a bona fide dispute, with the condition that the sum offered, if taken at all, must be received in full satisfaction of the claim, and the party receives the money, he takes it subject to the condition attached to it, and it will operate as an accord and satisfaction.

Although we are most reluctant to disturb any jury's verdict, and especially a verdict rendered after a lengthy and expensive trial, we conclude that the court's failure to give request no. 21 was reversible error.

It is the duty of the court to charge the jury on the law as to every controlling, material, substantial[,] and vital issue in the case. Where the court fails to give the benefit of a theory of the defense which is sustained by the evidence, a new trial must be granted.

*Pritchett v. Anding*, 168 Ga. App. 658, 663 (6) (310 SE2d 267) (1983).
After a verdict and judgment, an appellate court must construe the evidence with every inference and presumption in favor of upholding the verdict in the face of motions for a new trial or motions for j.n.o.v. See, e.g., *Cohen v. Lowe Aviation Co.*, 221 Ga. App. 259 (470 SE2d 813) (1996). On the other hand, when we decide whether a jury instruction should have been given, we do not allocate inferences and presumptions but merely examine the record to see if evidence was presented which created a substantial, material, and controlling issue in the case. See generally *Pritchett*, supra at 663; *King v. Luck Illustrating Co.*, 21 Ga. App. 698 (94 SE 890) (1918). The test for whether such an issue was created is whether the evidence, if believed by a jury in accordance with the disputed jury instruction, would have affected the outcome. It is also necessary to decide whether the law given in the disputed charge was adequately explained by other portions of the trial court's instruction.
In the case at bar, if the court's giving of part A of the pattern

charge, defendant's request to charge no. 20, adequately explained the defense, then no error would exist from the court's failure to give part B of the pattern charge, defendant's request to charge no. 21. There is no requirement "that [a] court instruct in the exact language of the request, even though the request may be correct as an abstract principle of law which is directly applicable to a material issue." (Punctuation omitted.) *Harper v. Samples*, 164 Ga. App. 511, 514-515 (5), (6) (298 SE2d 29) (1982), quoting *Seagraves v. ABCO Mfg. Co.*, 121 Ga. App. 224, 226 (3) (173 SE2d 416) (1970).

We will first discuss whether the evidence made the disputed charge "directly applicable to a material issue" and then discuss whether the requested charge was redundant in view of the court's having given part A of the pattern charge.

There was evidence of a dispute between the parties as to the final price, which dispute, according to Golden Peanut's evidence, lasted from July through mid-October 1990. Bass and John Varner, principals of the corporate plaintiffs, testified that representatives of Golden Peanut and plaintiffs disagreed over the price, and Jerry Adams, a banker who loaned money to plaintiffs, testified without objection that Bass and Varner told him about the dispute concerning the 1990 crops. Likewise, Coan, Golden Peanut's president, testified that the parties disagreed about the final price of the peanuts. Further, in his opening statement, counsel for plaintiffs referred to several disagreements between the parties in September and October. *John H. Smith, Inc. v. Teveit*, 175 Ga. App. 565, 567 (1) (a) (333 SE2d 856) (1985) ("Statements of counsel during the trial of a case may be regarded as admissions in judicio.") (punctuation omitted).

Next, there is evidence that Coan made a final offer to plaintiffs to settle the claim during a telephone conversation with Bass and Varner in mid-October. Bass testified that following the "pretty heated conversation," Coan said: "I'm tired of negotiating with y'all. You're going to take 875 and be happy with it, and that's the deal. You are not going to get anything on the additionals." According to Varner, there was "no question" that Coan said, "you're going to take it, you're going to be happy. I'm going to pay you the floor price on the additionals. I'm going to pay you 875 on the quotas, and we are going to stop talking about 1990."

The evidence further demonstrates that Golden Peanut tendered the payment offered by Coan, and plaintiffs accepted that payment. Both Bass and Varner testified that they never attempted to lock in a different price for the 1990 crops with Golden Peanut. Accordingly, despite plaintiffs' contention that they believed that the amount tendered by Golden Peanut was merely a partial payment, we find that the evidence warranted the rejected jury charge on accord and satisfaction. The next jury may believe the defendant's evidence, or it may

believe the plaintiffs' argument that no good faith dispute existed, and no offer to settle was ever made. We cannot weigh the evidence nor predict the outcome. But it is clear that the rejected jury charge was adjusted to the evidence.

Plaintiffs argue that the error, if any, was harmless, because the refused charge was substantially covered by the charge given. We disagree.

The jury was given part A of the pattern charge on accord and satisfaction. According to the official note to that paragraph, the charge is a restatement of OCGA § 13-4-101 "in simplified form." The first sentences of the charge would be applicable to all accords and satisfactions. They are, like novations, new contracts substituted for old. See 6 Corbin on Contracts, § 1293, p. 189 (1962). But an existing contract can be discharged pursuant to OCGA § 13-4-101 only where there is an express agreement to a satisfaction or new consideration. See, e.g., *Fowler v. Gorrell*, 148 Ga. App. 573 (251 SE2d 819) (1978); *Wood v. Wood*, 239 Ga. 120 (236 SE2d 68) (1977); *McCullough v. Mobiland, Inc.*, 139 Ga. App. 260 (228 SE2d 146) (1976). There does not appear to have been any new consideration. Moreover, neither party claims that there was ever an express agreement that a new arrangement existed which would satisfy the claims of Varner-Bass to a higher price. There are numerous decisions interpreting OCGA § 13-4-101 which stress the necessity for a "meeting of the minds." See, e.g., *Fowler*, supra; *Clark Equip. Credit Corp. v. Refrigerated Transp. Co.*, 148 Ga. App. 405 (251 SE2d 321) (1978); *First Nat. Bank of Gainesville v. Appalachian Indus.*, 146 Ga. App. 630 (247 SE2d 422) (1978). Whatever the confusing and much contested trial evidence does show, it fails to show a meeting of the minds.

By contrast, part B of the pattern charge, which the court declined to give, describes a nonstatutory form of accord and satisfaction, having a different lineage than part A, and being more closely adjusted to the evidence at trial. The precise language of the charge first appeared in 1921 in *Riley & Co. v. London Guaranty &c. Co.*, 27 Ga. App. 686 (109 SE 676) (1921), relying on similar language in the seminal decision of *Redmond & Co. v. Atlanta &c. R.*, 129 Ga. 133 (58 SE 874) (1907). *Redmond & Co.* relied on decisions from other American jurisdictions and on language in the earlier Georgia case of *Hamilton & Co. v. Stewart*, 105 Ga. 300 (31 SE 184) (1898). In the 1898 decision Justice Cobb asserted that: "Nothing could be clearer than the proposition that where one person delivers to another property, to be retained upon the condition stated, the party receiving it cannot retain the property and repudiate the condition." Id. at 302.

Significantly, part B requires no meeting of the minds. The satisfaction occurs by operation of law if the claimants keep the payment knowing of the implied condition. We have held that a creditor's

acceptance of such a conditional payment extinguishes the disputed debt, "notwithstanding the fact that [the creditor] protests at the time that the remainder of the account is still due and owing." (Punctuation omitted.) *Chrietzberg v. Kristopher Woods, Ltd.*, 162 Ga. App. 517, 518 (292 SE2d 100) (1982). Accord *Collins v. Commercial Union Ins. Co.*, 154 Ga. App. 450, 451 (268 SE2d 685) (1980); *Redmond & Co.*, supra at 141 (" 'notwithstanding any protest he may make to the contrary' "). The Georgia rule on this matter is in accord with the general view in common law jurisdictions. See, e.g., *Frank Culver Elec. v. Jorgenson*, 136 Ariz. 76 (664 P2d 226) (1983); *Flambeau Products Corp. v. Honeywell Information Systems*, 116 Wis.2d 95 (341 NW2d 655) (1984). See generally Restatement (2d) of Contracts, § 281.

The plaintiffs deny that any conditions were stated when the payment of approximately $900,000 was made by Golden Peanut in October 1990. They are correct that no notation on the check said "payment in full" and that no accompanying paperwork stated conditions. Furthermore, the plaintiffs are correct that the document labeled "Varner-Bass Settlement Report," which accompanied the payment, is not necessarily determinative because all payments were accompanied by similar "settlement reports." But the testimony of Coan and that of Bass and Varner raise jury issues as to whether the telephone conversation of mid-October was an offer to settle and whether the payment was accompanied by the requisite implied condition.

The plaintiffs contend that their acceptance of the $900,000 payment and their later acceptance of $875 per ton for new deliveries of quota peanuts and of the floor price for additional peanuts did not constitute an acceptance of Coan's offer to settle but were merely acceptances of partial payments of the total amount due to them. Their assertions, even if true, would not avail them if a bona fide dispute existed and if Coan did in fact attach the requisite condition to the payments. Even a partial payment admittedly due will extinguish the whole debt if a bona fide dispute exists, and the offeror makes the payment conditional on its acceptance being a satisfaction. *Riley & Co.*, supra at 687, citing, e.g., *Chicago &c. R. Co. v. Clark*, 178 U. S. 353, 367 (20 SC 924, 44 LE 1099) (1900). But if no bona fide dispute exists, then acceptance of a partial payment does not work a satisfaction. *Riley & Co.*, supra, citing *Alfred Struck Co. v. Slicer*, 23 Ga. App. 52, 55 (97 SE 455) (1918). Ultimately, whether a bona fide dispute existed in mid-October and whether the payments were made conditionally were questions for the jury. But it is clear that part A of the pattern charge did not adequately cover the issues raised by the evidence. The failure to give part B of the pattern

charge deprived Golden Peanut of defenses fairly raised by the evidence.

2. Although no issue is raised on appeal concerning whether Golden Peanut's objection to the trial court's failure to give its request to charge no. 21 was sufficient to preserve this issue for appellate review, our research has disclosed conflicting opinions on what is necessary to preserve objections to the trial court's failure to give a written request to charge. For instance, we have held on several occasions that grounds for objection to the failure to give written requests to charge need not be stated at the conclusion of the charge; it is enough if the party voices an objection or exception and simply refers to the number of the requested charge. See *Kres v. Winn-Dixie Stores*, 183 Ga. App. 854, 856 (3) (360 SE2d 415) (1987) (whole court); see also *Robinson v. MARTA*, 197 Ga. App. 628 (1) (399 SE2d 252) (1990); *City of Dalton v. Smith*, 210 Ga. App. 858, 860 (5) (437 SE2d 827) (1993) (dictum).

However, there are other decisions of this Court which have held that a litigant must distinctly state the grounds for objection after the trial court fails to give a written request to charge in order to preserve the issue for appellate review. See, e.g., *Mays v. Farah U.S.A.*, 236 Ga. App. 1, 2 (2) (510 SE2d 868) (1999); *First Union Nat. Bank v. Cook*, 223 Ga. App. 374, 377-378 (6) (477 SE2d 649) (1996).[1] These decisions parallel those of federal courts interpreting Federal Rule of Civil Procedure 51, a rule which also requires that an objection and the grounds thereof must be stated after the trial court has instructed the jury. See, e.g., *Affiliated FM Ins. Co. v. Neosho Constr. Co.*, 192 FRD 662 (D. Kan. 2000).

Many of our panel decisions trace their ancestry to *Lissmore v. Kincade*, 188 Ga. App. 548, 551 (4) (373 SE2d 819) (1988), which has not been expressly overruled. However, *Lissmore* relied on *U. S. Security Warehouse v. Tasty Sandwich Co.*, 115 Ga. App. 764 (1) (156 SE2d 392) (1967), which was expressly disapproved by the Supreme Court in *Continental Cas. Co. v. Union Camp Corp.*, 230 Ga. 8, 14-17 (2) (195 SE2d 417) (1973), and on *Ga. Power Co. v. Maddox*, 113 Ga. App. 642, 643-646 (1) (149 SE2d 393) (1966), which was disapproved

---

[1] Accord *Adams v. MARTA*, 246 Ga. App. 698 (542 SE2d 130) (2000); *K-Mart Corp. v. Lovett*, 241 Ga. App. 26 (525 SE2d 751) (1999); *Gay v. Hatfield*, 237 Ga. App. 826 (516 SE2d 856) (1999); *Alpha Beta Dickerson Southeastern v. White Co.*, 235 Ga. App. 273 (509 SE2d 351) (1998); *Evans Toyota v. Cronic*, 233 Ga. App. 318 (503 SE2d 358) (1998); *Anderson v. State*, 231 Ga. App. 807 (499 SE2d 717) (1998); *Bedeski v. Atlanta Coliseum*, 224 Ga. App. 435 (480 SE2d 881) (1997); *Gen. Accident Ins. Co. v. Straws*, 220 Ga. App. 496 (472 SE2d 312) (1996); *James v. Tyler*, 215 Ga. App. 479 (451 SE2d 506) (1994); *Roswell Properties v. Salle*, 208 Ga. App. 202 (430 SE2d 404) (1993); *Kittles v. Kittles*, 187 Ga. App. 537 (370 SE2d 803) (1988); *Carpet Transport v. Dixie Truck Tire Co.*, 185 Ga. App. 181 (363 SE2d 840) (1987).

and overruled by the Supreme Court in *Christiansen v. Robertson*, 237 Ga. 711, 712 (229 SE2d 472) (1976). Moreover, all of the decisions following *Lissmore* and *U. S. Security Warehouse* are panel decisions which seem to be in conflict with our controlling, unanimous, whole court decision in *Kres*. See OCGA § 15-3-1 (d) ("[a] decision concurred in by all the Judges shall not be overruled or materially modified except with the concurrence of all the Judges").

In the seminal decision of *Continental Cas.*, supra, the Supreme Court expressly rejected the federal rule and made a distinction between subsections (a) and (b) of Code Ann. § 70-207, now OCGA § 5-5-24. The Court stated that objections to the charges which the trial judge did give are governed by subsection (a); therefore, a litigant must state distinctly the grounds for an objection to the charge as given. Id. at 16. By contrast, the Court stated expressly that subsection (b), and not subsection (a), governs how written requests to charge will be "handled" by a trial court. The Supreme Court noted that subsection (b) makes no mention of objections. Id. It then concluded that a mere objection to the trial court's refusal to give a requested written charge, without restating the grounds, is adequate to preserve the issue for appeal. Writing for the majority, Justice Hawes reasoned as follows:

> [N]o useful purpose could possibly be served by requiring that the grounds upon which counsel contend the charge should be given be repeated after the court has announced to counsel its decision that the requested charge will not be given and has instructed the jury omitting such requested charge. After the charge has been given, to require a restatement of grounds of objection to the refusal to charge timely submitted written requests would be putting form ahead of substance — a result we should always endeavor to avoid.

*Continental Cas.*, supra at 17 (2).

The *Continental Cas.* opinion expressly holds that a party which has submitted a written request to charge need not "restate," after the court has instructed the jury, the grounds for the party's objection to the court's omission of the requested charge. Justice Hawes, speaking for the Court, thus implies that the reason has already been stated to the trial judge. The opinion explains that "the court normally affords such party at that time[, i.e., when the charges are submitted,] an opportunity to state the grounds. . . ." Id. at 16 (2). The opinion does not address whether the charge conference must be reported or whether the grounds must appear somewhere in the record.

The otherwise clear decision in *Continental Cas.* does make a

confusing distinction between a trial court's *failure* to give a charge and its *refusal* to give a requested charge. Id. at 16 (2). The opinion states that subsection (a) of the Code section "relates to the manner in which a party may complain of the giving or of the *failure* to give an instruction to the jury." (Emphasis in original.) Id. The opinion then states that subsection (b) relates to the manner in which written requests shall be submitted and handled by the court. The opinion pointed out that, unlike subsection (a), subsection (b) contains no provision relating to objections to the *refusal* to grant requests to charge. Id.

The confusion between *failure* and *refusal* to give a charge was eliminated by *Kres v. Winn-Dixie Stores*, supra, a 1987 unanimous whole court decision, where Judge Carley (now Justice Carley) parenthetically modified "failure" with the words "without request." Id. at 856 (3). The whole court decision quoted with approval *Roberson v. Hart*, 148 Ga. App. 343, 344 (1) (251 SE2d 173) (1978), where it was explained that

> "(a)lthough past decisions may suggest that objections to the court's refusal to charge as requested are controlled by the same rule governing objections to the failure to charge (without request) or objections to the charges as given ((cits.)), the Supreme Court has held otherwise."

*Kres*, supra at 856 (3). Thus, *Continental Cas.*, as interpreted by our controlling whole court decision, stands for the proposition that subsection (a) of the applicable Code section governs objections to a court's having given a particular charge or its failure to give an unrequested charge, and subsection (b) governs objections to the court's refusal to give a properly requested written charge. The holdings of *Continental Cas.* and *Kres*, taken together, provide that all objections regarding a jury charge must be made on the record after the jury has been instructed, but that objections made after the charge to the court's refusal to give a timely requested written charge need not be accompanied by the grounds for the objection.

Because we are bound by the Supreme Court decision of *Continental Cas.* and by our unanimous, whole court decision in *Kres*, it appears that *Adams v. MARTA*, 246 Ga. App. 698 (542 SE2d 130) (2000); *K-Mart Corp. v. Lovett*, 241 Ga. App. 26 (525 SE2d 751) (1999); *Gay v. Hatfield*, 237 Ga. App. 826 (516 SE2d 856) (1999); *Mays v. Farah U.S.A.*, supra; *Alpha Beta Dickerson Southeastern v. White Co.*, 235 Ga. App. 273, 276-277 (2) (509 SE2d 351) (1998); *Evans Toyota v. Cronic*, 233 Ga. App. 318, 322 (3) (a) (503 SE2d 358) (1998); *Anderson v. State*, 231 Ga. App. 807, 810-811 (3) (a) (499 SE2d 717) (1998); *Bedeski v. Atlanta Coliseum*, 224 Ga. App. 435 (1)

(480 SE2d 881) (1997); *First Union Nat. Bank v. Cook*, 223 Ga. App. 374 (477 SE2d 649) (1996); *Gen. Accident Ins. Co. v. Straws*, 220 Ga. App. 496, 497-498 (2) (472 SE2d 312) (1996); *James v. Tyler*, 215 Ga. App. 479, 481-482 (5) (451 SE2d 506) (1994); *Roswell Properties v. Salle*, 208 Ga. App. 202 (430 SE2d 404) (1993); *Lissmore v. Kincade*, supra; *Kittles v. Kittles*, 187 Ga. App. 537, 539-540 (5) (370 SE2d 803) (1988); and *Carpet Transport v. Dixie Truck Tire Co.*, 185 Ga. App. 181, 183-184 (2) (363 SE2d 840) (1987), and any like opinions, were incorrectly decided and should no longer be followed. We need not overrule *Ga. Power Co. v. Maddox*, supra, as its gravamen was expressly overruled by a whole court decision of this Court in *A-1 Bonding Svc. v. Hunter*, 125 Ga. App. 173, 183 (186 SE2d 566) (1971) (Chief Judge Bell speaking for the Court in an "addendum" to the opinion). *Ga. Power Co.* was also expressly overruled in 1976 by the Supreme Court in *Christiansen*, supra.

In the case at bar, counsel for Golden Peanut made his objections to the trial court's jury instructions using the two different techniques authorized by our whole court decision in *Kres* and by the Supreme Court in *Continental Cas.* Counsel for Golden Peanut first made a minimalist, perfunctory objection to the court's *failure* to give the charges he had requested, to wit: "We object to the failure to give defendant's request to charge No. 21, 22, 23, 25, 26, 28." He then went on, as required by OCGA § 5-5-24 (a), to state more elaborate objections to the charges the court *did* give, stating the grounds for each objection, to wit:

> We object to the Court instructing the jury that if a person willfully testifies falsely, that they are required to disregard or shall disregard the remainder of their testimony unless corroborated. The jury has discretion to determine . . . or accept any part of a witness' testimony. I object to the burden of proof charge on confidential relations, not only in imposing the burden on the defendant, but the charge as written suggested to the jury as if the Court were commenting on the evidence in that we had failed to read the agreement. We object to the Court charging that the agreement on additional peanuts is legally enforceable. . . .

The minimalist objection by Golden Peanut to the failure to give timely submitted written requests to charge was adequate to preserve the objection according to *Continental Cas.* Significantly, in that case, appellant's counsel did not even mention the numbers of the refused charges. The precise objection which was held to have been adequate to preserve the issue was the following: "Your Honor, I object to the failure of the court to charge those charges that I gave

that the court did not give." *Continental Cas.*, supra at 15 (2).[2] The objection obviously fails to state the grounds of the objection, and the Supreme Court used the opportunity expressly to disapprove our holding in *U. S. Security Warehouse v. Tasty Sandwich Co.*, supra, "and all other cases to a like effect." *Continental Cas.*, supra at 17 (2).

Similarly, *Kres* held that an alleged error was preserved for appeal by counsel merely objecting "to the Court's failure to charge [her] Request to Charge [No. 15]. . . ." (Punctuation omitted.) Id. at 856 (3). Accord *Robinson v. MARTA*, supra at 628 (1); *City of Dalton v. Smith*, supra at 860 (5) (" 'unnecessary for [a] party to state grounds of objection' "). The decision in *Kres* was concurred in by all nine judges then on our Court. However, the *Kres* decision was not mentioned by the later panel decisions of *Carpet Transport* (1987), *Kittles* (1988), *Lissmore* (1988), *Roswell Properties* (1993), *James* (1994), *Gen. Accident Ins. Co.* (1996), *First Union* (1996), *Bedeski* (1997), *Anderson* (1998), *Alpha Beta Dickerson* (1998), *Evans Toyota* (1998), *Gay* (1999), *Mays* (1999), *K-Mart* (1999), and *Adams* (2000). See OCGA § 15-3-1 (d) ("A decision concurred in by all the Judges shall not be overruled or materially modified except with the concurrence of all the Judges.").

Although we find that Golden Peanut did all that it was required to do to preserve its objections to the trial court's refusal to give its written requests to charge, this does not end our consideration of this issue. Both *Continental Cas.* and *Kres* are premised on the rationale that it is unnecessary for litigants to state their grounds for objections to the trial court's failure to give their written requests to charge at the conclusion of the charge because they have already done so. Thus, *Continental Cas.* states that the ground of objection need not be *"restated." Continental Cas.*, supra at 17. This obviously implies that the reason has already been stated to the trial judge. And *Kres* states

> [t]hus, where the trial court refused to instruct the jury in accordance with a timely submitted written request, in order to secure review of that action on appeal it is unnecessary for the party to state grounds of objection to such refusal at the conclusion of the charge. *It is only necessary that the refusal to charge be objected to at some point.*

(Citations and punctuation omitted; emphasis supplied.) Id. at 856-857 (3). As *Continental Cas.* explains, the requirements of OCGA § 5-5-24 (b) that the charges be submitted to the court and served on the

---

[2] The parties stipulated that a general objection was sufficient "basis for the record" without reading the request into the record.

opposing party afford the trial court "every opportunity to be informed as to the contention of the respective parties concerning such request." Id. at 17 (2). Moreover, the statute requires the trial court to inform the parties of its proposed action upon the requests prior to argument.

Neither *Continental Cas.* nor *Kres* requires that these pre-charge objections or discussions appear on the appellate record. Obviously, if the requested charge is a pattern charge, such as the one in the case at bar, or otherwise embodies a well-established principle of law, the argument urged to the court in support of giving the charge might itself be quite minimal. When the request is a pattern charge approved by the Council of Superior Court Judges, a citation to the book of Suggested Pattern Jury Instructions, placed at the bottom of the written request, should suffice to alert the trial court to counsel's contention that the requested instruction is valid law in Georgia. Similarly, a party's submission of a written charge is an assertion that counsel believes that the requested instruction is adjusted to the evidence presented at trial. Nothing else should be needed to preserve for appeal an objection to the court's refusal to give such a charge except, of course, a reminder to the trial judge after the judge has instructed the jury that the party still objects or excepts to the charge not having been given. As explained by the Supreme Court of a neighboring state, we should not require "that the objecting party, in order to preserve for review an erroneous jury instruction, . . . deliver a discourse before the trial judge on the applicable law of the case." *Gardner v. Dorsey*, 331 S2d 634, 637 (Ala. 1976).

On the other hand, there are other cases involving charges on novel points of law, in which a record of what transpired below would greatly aid this Court in deciding the issue on appeal. In novel cases, it would be helpful for counsel to cite on the record what authority supports the validity of the legal point made in the requested charge and precisely which evidence at trial makes the legal point applicable. Moreover, this comports with our general rule of appellate procedure that we will not consider grounds on appeal which are different from those urged below, and this rule pertains to objections to charges as well as other trial matters. See, e.g., *City of Dalton*, supra at 858-859 (1).

Thus, the better practice, and the one we would urge the litigants and courts of this state to follow, is that the grounds of objection, i.e., the reasons urged for the requested charge, should be placed somewhere on the record, although all that is needed after the charge is a perfunctory objection identifying the omitted requested charge. And while the record need not be made with any particular formality, enough should appear so that the reviewing court can ascertain the grounds urged below.

3. While we conclude that the court erred in not giving the pattern jury charge on the theory of accord and satisfaction, we reject Golden Peanut's contention that the court erred in denying its motions for directed verdict and j.n.o.v. on that issue.

It is well settled that the standard of appellate review of the denial of both a motion for directed verdict and a motion for j.n.o.v. is the any evidence test. *Pulte Home Corp. v. Woodland Nursery &c.*, 230 Ga. App. 455, 456 (2) (496 SE2d 546) (1998).

> The question before this court is not whether the verdict and the judgment of the trial court were merely authorized, but is whether a contrary judgment was demanded. A judgment n.o.v. is properly granted only when there can be only one reasonable conclusion as to the proper judgment; if there is any evidentiary basis for the jury's verdict, viewing the evidence most favorably to the party who secured the verdict, it is not error to deny the motion.

(Citations and punctuation omitted.) Id. See also *Ruben's Richmond Dept. Store v. Walker*, 227 Ga. App. 867 (490 SE2d 536) (1997); *Professional Consulting Svcs. &c. v. Ibrahim*, 206 Ga. App. 663, 665 (1) (426 SE2d 376) (1992).

Based on this standard, we conclude that there was evidence to support the rejection of Golden Peanut's accord and satisfaction defense and that the trial court properly denied the motion for directed verdict and submitted the case to the jury. Likewise, because there was an evidentiary basis for the jury's verdict, the court properly denied the motion for j.n.o.v.

4. Next, Golden Peanut argues that the court erred in denying its motions for directed verdict and j.n.o.v. as to plaintiffs' additional peanuts, alleging that plaintiffs' theory of recovery violates a federal statute and its implementing regulations. We note that the court's denial of the motions must be upheld if there is any supporting evidence and conclude that the court did not err. See *Pulte Home Corp.*, supra at 456.

According to the statute in force in 1990, 7 USC § 1359 (a) (1988), additional peanuts could be marketed only through contracts that complied with federal regulations. The applicable regulations required that "the final contract price" of the additional peanuts appear on the contract and that the contract contain a prohibition against changing the price. 7 CFR § 1446.107 (a) (7), (12) (1990). In order for a contract to be approved, the contract price for additional peanuts must have been "[e]xpressed in such a manner that a third party may determine . . . the actual price of the peanuts without a need for additional negotiations." 7 CFR § 1446.108 (a) (1990). In

1990, contracts for additional peanuts had to be submitted to the local ASCS office by July 31. 7 CFR § 1446.107 (a).

Golden Peanut argues that the contracts at issue failed to comply with the applicable federal regulations because they did not specify a final price for additional peanuts other than the stated "floor price," nor did they contain a formula by which a third party could determine the higher price. Thus, the additional peanuts could not have been purchased for a price higher than that specified in the contract. According to Golden Peanut, plaintiffs' theories of recovery based on an alleged agreement that they could pick a market price at any time during the year were illegal and unenforceable. We reject this argument.

As a preliminary matter, we note that the three amici are correct that federal regulation of the production and marketing of peanuts is supreme, and we are in no way contesting or diminishing the federal authority to regulate the peanut industry. If Georgia sought to regulate any aspect of the production and marketing of peanuts, the applicable federal regulations would preempt the state legislation and render it void. See generally *Gentry v. Volkswagen of America*, 238 Ga. App. 785, 786-787 (2) (521 SE2d 13) (1999). But Georgia has not attempted to regulate the peanut industry. It is clear that the federal regulatory scheme contemplates the sale of peanuts, and it is certainly foreseeable that disputes over contracts for the sale of peanuts would be resolved in state court in accordance with state law. The federal regulations do not expressly provide that a contract that is not in accordance with the regulations is necessarily void. Thus, we turn to Georgia law to determine whether the contracts required illegal conduct and were therefore unenforceable.

The contracts were negotiated by the parties and were actually prepared on a form supplied by Golden Peanut. Because Golden Peanut was one of the largest peanut shellers in the industry, it might be presumed that Golden Peanut was familiar with the applicable federal regulations. We are therefore troubled by one who negotiated a contract that it knew, or should have known, violated federal regulations subsequently attempting to evade its performance of that contract by claiming that the contract violated those regulations.

Regardless, while Georgia law dictates that a court cannot enforce a contract "to do an immoral or illegal thing," we do not find that the contracts in the case sub judice required illegal conduct. See OCGA § 13-8-1; *Moore v. Dixon*, 264 Ga. 797 (452 SE2d 484) (1994). See also *Adams v. Trust Co. Bank*, 206 Ga. App. 554 (426 SE2d 36) (1992); *Golden Peanut Co. v. Hunt*, 203 Ga. App. 469 (416 SE2d 896) (1992).

Our recent decision, cited by amicus, *Maner v. Chatham County*, 246 Ga. App. 265 (540 SE2d 248) (2000), is distinguishable. In that case, a defendant successfully escaped compliance with its contrac-

tual obligations because the county employee who made the promises lacked authority to enter into contracts on the county's behalf and also because the promises required violation of explicit state statutes involving police officers and public safety. By contrast, the three amici ask this Court to deny enforcement of a contract negotiated between experienced business persons on the ground that the contract violated technical aspects of complex federal regulations regarding price specification in contracts for the sale of farm products. If the contracts were executory, we might be inclined to leave the parties as we find them. But the contracts in dispute have been performed, tens of thousands of tons of peanuts have been delivered, and the remaining dispute concerns only price. The farmers were entitled at least to quantum meruit.

Furthermore, the evidence does not preclude a finding that the contracts complied with federal regulations. First, we recognize that nine ASCS offices independently approved the contracts as complying with federal regulations. At a minimum, there was evidence to support plaintiffs' contention that the parties had agreed to a method for determining the final price of additional peanuts by locking in a market price later in the year. Accordingly, we conclude that the court did not err in denying Golden Peanut's motions for directed verdict and j.n.o.v. as to the additional peanuts.

5. Golden Peanut assigns error to the court's denial of its motion for j.n.o.v., based on its contention that the jury impermissibly relied on parol evidence of the parties' alleged agreement to lock in a price later in the year. Golden Peanut argues that evidence of an alleged oral agreement reached before the contracts were executed was barred by the contracts' merger clause.

As a preliminary matter, we recognize that Golden Peanut failed to object to the admission of parol evidence at trial and actually introduced its own parol evidence. Golden Peanut's failure to object acts as a waiver of this argument on appeal. *Franklin v. Towe*, 233 Ga. 950 (3) (213 SE2d 892) (1975). Likewise, Golden Peanut's introduction of parol evidence waived any argument it might have regarding plaintiffs' parol evidence. See *Williams v. Mem. Med. Center*, 218 Ga. App. 107, 108 (2) (460 SE2d 558) (1995).

For purposes of retrial, we note that it is well settled that parol evidence is admissible to explain ambiguities in a written agreement. OCGA §§ 24-6-3 (b); 13-2-2 (1); *Empire Distrib. v. George L. Smith II Ga. &c. Auth.*, 235 Ga. App. 742, 744 (509 SE2d 650) (1998). "Parol evidence is admissible to explain all ambiguities, the question as to what was intended being an issue of fact for the jury." (Citations and punctuation omitted.) *Alpha Beta Dickerson Southeastern v. White Co.*, supra at 275 (1).

In the case sub judice, plaintiffs introduced parol evidence of the

parties' agreement to lock in a higher price later in the year to explain the meaning of the term "floor price" in the contracts. Because parol evidence is admissible to complete an agreement, the court did not err in allowing the jury to consider it. See *Preferred Risk Mut. Ins. Co. v. Jones*, 233 Ga. 423, 424-425 (1) (211 SE2d 720) (1975). Furthermore, evidence of the agreement to lock in a price was not inconsistent with or contradictory to the written contracts. Compare *Golden Peanut Co. v. Hunt*, supra at 471.

6. Finally, Golden Peanut argues that the court erred in charging the jury on OCGA § 11-2-305 (3), which provides: "When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through the fault of one party[,] the other may at his option treat the contract as cancelled or himself fix a reasonable price." Golden Peanut contends that the charge was inapplicable to the evidence and misled the jurors by leading them to believe that Golden Peanut's refusal to pay the disputed amount gave plaintiffs the right to fix a price bearing no relationship to the contracts. See *John D. Robinson Corp. v. Southern Marine &c. Co.*, 196 Ga. App. 402, 408-409 (395 SE2d 837) (1990).

There was evidence, however, that the parties had agreed to a method for arriving at a price, by which plaintiffs would lock in a market price during the year. There is at least some evidence that Golden Peanut prevented plaintiffs from locking in a price and, thus, caused the "floor price" agreement to fail. At a minimum, the evidence presented a jury question as to the fault of Golden Peanut.

Golden Peanut relies on a Seventh Circuit case for the proposition that the charge at issue applies only when some action by the parties is required to enable a third party or external agency to set the price in accordance with the agreement. *Weisberg v. Handy & Harman*, 747 F2d 416, 420 (7th Cir. 1984). However, Golden Peanut has cited no Georgia case to support its argument, and our research reveals none. Moreover, OCGA § 11-2-305 (3) is silent as to third parties. Because it is the duty of the court to charge the jury on the law as to every issue in the case which is even minimally sustained by the evidence, we cannot conclude that the court erred in charging the jury on this issue. *Pritchett*, supra at 663.

*Judgment reversed. Blackburn, C. J., Johnson, P. J., Eldridge and Ellington, JJ., concur. Pope, P. J., Smith, P. J., Ruffin, Barnes and Miller, JJ., concur and concur specially as to Division 2. Andrews, P. J., concurs and concurs specially as to Division 3. Phipps, J., not participating.*

ANDREWS, Presiding Judge, concurring specially.

Although I concur fully in Divisions 1, 2, 4, 5, and 6, I must concur specially as to Division 3 because I believe Golden Peanut (Golden) was entitled to a directed verdict on the issue of accord and

satisfaction.

As set out in the majority, it is not disputed that in October 1990, Coan, on behalf of Golden, told Bass and Varner that $875 per ton on the quota peanuts and the floor price on the additional peanuts was all that Golden was going to pay and there would be no further discussion of the 1990 peanuts. It is also undisputed that, after this declaration by Coan, Varner-Bass was sent, received, and cashed over $900,000 in payments based on the $875 per ton quota peanuts and floor price per ton additional peanuts. As Bass testified, "we had to take it. We couldn't turn down any checks." Varner estimated that his and Bass' personally guaranteed debt for Varner-Bass was approximately $36 million and they did not refuse the money paid by Golden or make any protest at that time that additional monies were owed on the 1990 peanuts.

The later protest, made by instituting this litigation and contending in response to Golden's motion for directed verdict and judgment notwithstanding the verdict that the payments were accepted only as an advance on a larger sum, was unavailing. *Redmond & Co. v. Atlanta &c. R.*, 129 Ga. 133, 136 (58 SE 874) (1907) (acceptance of money due to great financial distress does not prevent accord and satisfaction); *Hamilton & Co. v. Stewart*, 105 Ga. 300, 302 (31 SE 184) (1898); *M. Walter & Co. v. North Highland Assembly of God*, 188 Ga. App. 852 (374 SE2d 792) (1988).

Therefore, I believe Golden was entitled to a directed verdict or j.n.o.v. on the defense of accord and satisfaction. See *Gary v. E. Frank Miller Constr. Co.*, 208 Ga. App. 73, 75 (2) (430 SE2d 182) (1993).

MILLER, Judge, concurring specially.

I concur fully with the result reached by the majority, but write specially with regard to Division 2. In assessing any error in the failure of the trial court to give a written request to charge, our main concern is whether at *some* point the grounds for the objection have been given on the record. Of course if the grounds were given prior to the charge to the jury, and this court has those grounds of record, there is no requirement that they be restated, and this court can review the error after determining whether those same grounds are argued on appeal. It is well established that review of the charge enumerated is limited to the ground of objection stated at trial.[3] In summary, my view is that the proper method of making an objection to a requested charge that was not given is to state that objection and the charge, and then state the legal basis. As a practical matter, this gives the trial judge a final opportunity to evaluate whether the grounds given require the giving of the charge or whether an additional charge should be given prior to the jury beginning its delibera-

---

[3] *Benson v. Tucker*, 160 Ga. App. 217, 218 (1) (286 SE2d 485) (1981).

tions. This will assist in maintaining the integrity of the verdict and eliminate the need for appeals on this issue.

I am authorized to state that Presiding Judge Pope, Presiding Judge Smith, Judge Ruffin and Judge Barnes join in this special concurrence.

DECIDED MARCH 30, 2001 —
RECONSIDERATIONS DENIED APRIL 13, 2001 —

*Alston & Bird, Jay D. Bennett, Candace N. Smith, Paul J. Kaplan, Bondurant, Mixson & Elmore, Emmet J. Bondurant, Michael B. Terry, Frank M. Lowrey IV*, for appellant.

*King & Spalding, Griffin B. Bell, Benjamin F. Easterlin IV, Michael C. Russ, John P. Brumbaugh*, for appellees.

*Watson, Spence, Lowe & Chambless, Evans J. Plowden, Jr., Dawn G. Benson, Charles K. Wainright II*, amici curiae.