A97A0964. CAREAMERICA, INC. et al. v. SOUTHERN CARE CORPORATION.
(494 SE2d 720)

SMITH, Judge.
This appeal involves a dispute between the seller and purchaser of nursing homes. Several documents evidence complex transactions among the seller, the purchaser, and various financing institutions and governmental bodies involved in the transactions. We must decide whether certain provisions in those documents are ambiguous and should be construed to reflect the intent of the parties, or are clear and unambiguous and therefore require no construction. The trial court ruled that the documents are not ambiguous and granted summary judgment to the purchaser on that basis. We conclude that the provisions of at least one of the documents may be interpreted in more than one way, and that a construction that reflects the intention of the parties requires reversal of the judgment below.

In December 1991, Southern Care Corporation, a Texas corporation licensed to do business in Georgia, purchased four nursing homes in Georgia from Medical Resource Companies of America ("MRC") for the total purchase price of $16,122,000. Four development authorities in Georgia issued three series of revenue bonds (A, B, and C) to finance the acquisition. Pursuant to loan agreements covering the transaction, Southern Care borrowed the proceeds from the sale of the bonds and executed promissory notes and deeds to secure debt in favor of the issuers.

MRC took the bonds in exchange for the nursing homes it sold to

Southern Care, and the notes, deeds to secure debt, loan agreements, and other relevant documents were assigned by the bond issuers to Reliance Trust Company as trustee for the bondholders. The trustee's rights and duties were set forth in a trust indenture. Southern Care was to make payments on the notes to the trustee as required by the loan agreements, and the trustee was to disburse payments to MRC. In connection with the purchase, Southern Care entered into a contract with CareAmerica, Inc., a related corporation to MRC, to manage the nursing homes.

In March 1992, in anticipation of remarketing one series of bonds, the C bonds, in accordance with Article X of the trust indenture MRC purchased U. S. Treasury STRIPS[1] in sufficient amount to pay the debt service and principal on that series of bonds and deposited the Treasury STRIPS with the trustee. The effect of this deposit was to "defease" that bond issue by substituting the U. S. Treasury STRIPS for the C notes and security deeds previously held as collateral, severing the connection between the C bonds and the C notes and deeds to secure debt, and discharging the lien on the notes and security deeds. The trustee then assigned these notes and security deeds to MRC.

Southern Care assented to the assignment and executed the assignment documents. After the assignment, Southern Care continued to make payments on the notes. Several years later, however, Southern Care decided it was no longer obligated on the C notes, and when MRC insisted that the obligation remained, Southern Care filed separate actions against MRC and its principals and against CareAmerica. In the suit against MRC, Southern Care sought a declaration that it was no longer obligated on the C notes by virtue of the bond defeasance transaction, and it asserted claims for money had and received and conversion, seeking recovery of the funds paid to MRC after the defeasance transaction. Cross-motions for partial summary judgment were filed on the issue of the declaratory relief, and the trial court granted Southern Care's motion and denied that of MRC. This appeal was taken by MRC from that order.[2]

The C notes contained the following language: "If the amount held by the trustee in the series 1991C account of the bond fund shall be sufficient to pay at the times required the accreted principal amount of the series 1991C bonds then remaining unpaid, as provided in the indenture, the company [Southern Care] shall not be

---

[1] STRIPS (separate trading of registered interest and principal of securities) are zero coupon securities issued by the U. S. Treasury under a program established in 1985. They are offered at a substantial discount from face value. No interest is paid during the lifetime of the security, but the full face amount is paid at maturity.

[2] The CareAmerica action is not involved in this appeal.

obligated to make any further payments under this series 1991C note."

1. MRC asserts that the trial court erred in granting Southern Care's motion for summary judgment. Southern Care contended below that this language in the note was clear and unambiguous and required no construction. Southern Care argued that because MRC's deposit of the Treasury STRIPS caused the amount held by the trustee to be sufficient to pay the outstanding principal of the C bonds, under the clear language in the note Southern Care was not obligated to make any further payments on these bonds. Considering only the note, it is difficult to disagree with this conclusion.

In this case, however, the note cannot be viewed in isolation; all the documents must be considered, including the later assignment, because they are obviously interrelated. The assignment contained the following language: "The parties acknowledge that only the note, the third deed of trust[3] and the related financing statements are hereby assigned from the trustee to MRC, and that such documents are distinct and separate from any other documents executed by the corporation or held by the trustee. In conjunction with this assignment, and pursuant to Article X of the indenture, the trustee has accepted substitute collateral for the security of the . . . [series C bonds]. Therefore, the note and the third deed to secure debt no longer secure repayment of the bonds, and the note and the third deed to secure debt now represent the independent obligations of the corporation [Southern Care] to MRC." The trial court did consider the quoted language in the assignment but concluded that this language did not conflict with the language in the note or create an ambiguity. We agree with MRC that this was error.

The construction of contracts involves three steps. At least initially, construction is a matter of law for the court. First, the trial court must decide whether the language is clear and unambiguous. If it is, the court simply enforces the contract according to its clear terms; the contract alone is looked to for its meaning. Next, if the contract is ambiguous in some respect, the court must apply the rules of contract construction to resolve the ambiguity. Finally, if the ambiguity remains after applying the rules of construction, the issue of what the ambiguous language means and what the parties intended must be resolved by a jury. *Century 21 Pinetree Properties v. Cason*, 220 Ga. App. 355, 358 (2) (d) (469 SE2d 458) (1996).

Because the trial court determined that no document in issue was ambiguous, the second and third steps were never reached. The

---

[3] The deeds to secure debt were of third priority, subordinate to those covering the notes on the A and B series bonds.

trial court reasoned that the assignment language was unambiguous and the language in the assignment making the notes the "independent obligations" of Southern Care to MRC merely "reflect[ed] that if the substitute collateral becomes insufficient to satisfy the accreted principal amount under the agreement as it came due, then plaintiff [Southern Care] would be obligated to make payments under the note, as the bond would no longer be defeased as defined under Article X of the trust indenture." But the language in issue does not state that; and if we must resort to construction to decide its meaning, it cannot be clear and unambiguous. We agree that it *could* be so construed. But it could *also* be construed differently. It could mean that because the notes and security deeds no longer were tied to the bonds, Southern Care had no further obligation to the trustee but an "independent" obligation under the notes to the new assignee, MRC.

The language could reasonably be construed both ways, and it therefore cannot be deemed unambiguous; the intention of the parties simply is not clear from the contract language alone. *Kusuma v. Metametrix, Inc.*, 191 Ga. App. 255, 256 (2) (381 SE2d 322) (1989) (ambiguity exists when meaning uncertain and language may be fairly understood in more than one way). We must proceed with the next step in the contract construction process. We therefore look to the applicable rules of contract construction, bearing in mind that "[t]he cardinal rule of construction is to ascertain the intention of the parties." OCGA § 13-2-3.

"If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred." OCGA § 13-2-2 (5). In the present case both parties executed the assignment, but Southern Care was the party that executed the notes and undertook the obligation, referenced in the assignment, to pay them. The interpretation that does not relieve Southern Care of that obligation is therefore the one to be preferred. See generally *Promenade Assoc. v. Finish Line*, 194 Ga. App. 741, 742-743 (391 SE2d 714) (1990).

Further, although parol evidence is generally not admissible "to add to, take from, or vary a written contract," because the language of the provision in issue is not clear, we may consider "[a]ll the attendant and surrounding circumstances" to explain the ambiguity. OCGA § 13-2-2 (1). In this case, Southern Care confirmed its obligation to pay the C notes several times after the defeasance transaction, thereby confirming that the intention of the parties was not to cancel Southern Care's debt on those notes. In fact, Southern Care had discussions with its accountants regarding how to avoid payments on these notes, thus indicating its understanding of a continuing obligation.

In addition, MRC proffered the affidavit and deposition testi-

mony of John Konvalinka, which the trial court did not consider in ruling on the motions because it believed the documents were unambiguous.[4] Konvalinka served as bond counsel for the defeasance transaction. His affidavit and deposition contain strong, impartial evidence that it was the intention of the parties that Southern Care's obligation on the C notes continued, with payment required to MRC instead of to the trustee. He testified that "[a]t no time during the drafting of documents or discussions with any of the parties was any agreement to terminate the 1991C notes ever mentioned. To the contrary, at all times during the transaction, the manifested intent of the parties was to effect the purchase of the 1991C notes from the trustee by [MRC] which purchase would provide sufficient monies to defease the 1991C bonds." He testified that some discussion was had regarding the possibility of amending the C notes to reflect the change but this was rejected because it was believed that such an amendment executed shortly after the defeasance might have affected adversely the tax-exempt status of the bonds. According to Konvalinka, obtaining Southern Care's acknowledgment in the assignment agreement that MRC was not a successor trustee and that the C notes were now "independent obligations" of Southern Care was intended "to evidence the obligation of Southern Care Corporation to continue to make the payments provided in the 1991C notes that survived the defeasance of the 1991C bonds. We obtained an opinion of counsel to Southern Care Corporation with respect to each of the issues of 1991C bonds to the effect that the assignment was duly authorized and constituted legal, valid and binding obligations of Southern Care Corporation enforceable in accordance with its terms."

This evidence showing the circumstances surrounding the defeasance and assignment persuades us that in those transactions the parties intended simply that MRC would "purchase" the notes and sever the connection between the C bonds and the C notes by substituting higher grade collateral for the bonds so that it could market the bonds at a profit. The parties intended for MRC to be substituted for the trustee as the obligee of the notes and for Southern Care's obligation to continue as before except as to the identity of the obligee. Because this intention of the parties is clear when the rules of contract construction are applied, the trial court erred in granting Southern Care's motion for partial summary judgment on the declar-

---

[4] Contrary to Southern Care's protestations regarding the timeliness of the Konvalinka affidavit, because cross-motions for summary judgment were filed and heard, MRC was the respondent to and was opposing Southern Care's motion for summary judgment. OCGA § 9-11-6 (d) would therefore permit affidavits to be filed until the day before the hearing on a motion. OCGA § 9-11-56 (c) specifically so states.

atory judgment claim.

2. For the reasons discussed above, the trial court also erred in denying MRC's motion for summary judgment on the declaratory judgment claim.

3. To the extent that the trial court's order may be read as at least impliedly also granting partial summary judgment to Southern Care on its claims for money had and received and for conversion, any such grant must also be reversed. No unjust enrichment or conversion took place because any payments made on Southern Care's obligations under the C notes were properly made and properly received by MRC.

*Judgment reversed. McMurray, P. J., and Beasley, J., concur.*

DECIDED DECEMBER 3, 1997 —
RECONSIDERATION DENIED DECEMBER 18, 1997 — 

*Sutherland, Asbill & Brennan, Ann G. Fort, Sarah B. Estes, Peter J. Anderson, Kilpatrick Stockton, Susan A. Cahoon,* for appellants.
*Bouhan, Williams & Levy, Roy E. Paul,* for appellee.