A02A0141. FOREST COMMODITY CORPORATION v. LONE STAR INDUSTRIES, INC. et al.
(564 SE2d 755)

JOHNSON, Presiding Judge.

Construction Aggregates, Ltd., owned by Lone Star Industries, Inc. (jointly referred to as "CAL"), was in the business of mining and shipping aggregate stone. Forest Commodity Corporation ("FCC") owns an ocean terminal facility, where ships can unload and store bulk cargo. On August 1, 1994, CAL and FCC entered into a three-year contract for the "thru-putting" of aggregate stone. In the contract, FCC agreed to provide terminal space for unloading aggregate stone, which FCC would then store, reload onto trucks and weigh for transshipment. For the promised services, CAL agreed to pay FCC 90¢ per ton of aggregate stone unloaded at the FCC marine terminal and processed as described. CAL promised to unload a minimum of 150,000 tons per year, for a total of 450,000 tons over the three-year contract period. A fall-short provision of the agreement provided that CAL would pay FCC $1.50 per ton instead of 90¢ per ton if and to the extent CAL failed to ship the agreed tonnage under the agreement. The agreement also contained a provision prohibiting the assign-

ment or subcontracting of any portion of the obligations without the written consent of the other party.

During the first year of the contract period, CAL unloaded 148,236 tons of the aggregate at the FCC terminal. In August 1995, CAL unloaded an additional 49,934 tons of aggregate for a total of 198,170 tons. Soon thereafter, CAL entered into negotiations with Martin Marietta Materials, Inc. ("Martin Marietta") for the sale of CAL's assets. Martin Marietta agreed to accept CAL's rights and obligations under the agreement with FCC, and CAL requested that FCC accept an assignment of the thru-put agreement to Martin Marietta. FCC refused to consent to the assignment. Around this same time, FCC and Martin Marietta began negotiations and eventually entered into a substantially similar contract in the fall of 1995 for the thru-putting of aggregate. It is undisputed that after Martin Marietta's acquisition of CAL and its assets, and pursuant to the new contract entered into with FCC, Martin Marietta thru-put 286,698 tons of aggregate stone at the FCC terminal during the remainder of the original contract period for the CAL thru-put agreement. When combined with the 198,170 tons shipped by CAL, a total of 484,868 tons of aggregate stone was shipped through the FCC facility, 34,868 tons more than the guaranteed minimum under the original agreement.

FCC sued CAL for breach of contract, alleging CAL failed to ship the minimum amount of aggregate stone under the contract.[1] CAL filed a motion for summary judgment as to the breach of contract claim. The trial court granted the motion for summary judgment, finding that FCC was precluded from enforcing the contract because it failed to comply with the nonassignability clause. We find no error and affirm.

1. FCC contends that the trial court erred in granting summary judgment to CAL because there are genuine issues of material fact regarding whether FCC assigned the contract. However, the irrefutable evidence, even when construed in a light most favorable to FCC, points inevitably to the conclusion that an assignment of the CAL thru-put agreement was effected. An assignment occurs when one party transfers to another its interests and obligations in a contract.[2] The numerous items of undisputed facts in this case show that FCC's interests and obligations in the CAL thru-put agreement were transferred to Woodchips Export Corporation ("WEC") without the written consent of CAL, thereby violating the nonassignability clause of the

---

[1] This cause of action was added to FCC's original suit seeking to recover damages for injury to its real property allegedly caused when aggregate stone was negligently unloaded, causing the riverbank to give way under the improperly placed aggregate stone.

[2] *Bank of Cave Spring v. Gold Kist*, 173 Ga. App. 679, 680 (327 SE2d 800) (1985).

agreement and extinguishing any right to recovery which FCC may have had.

The thru-put agreement obligated FCC to provide a marine terminal facility for the off-loading of aggregate and to perform both the reloading of the aggregate onto trucks and the weighing of such trucks. Yet, the evidence in the record shows that the terminal facility where the CAL aggregate was off-loaded was leased by FCC to WEC. In addition, it is undisputed that FCC had no employees and no equipment to perform the obligations under the CAL agreement. FCC's vice-president admits that FCC had no employees and that FCC entered into an unwritten agreement with WEC under which WEC agreed to perform FCC's obligations as its operations agent.

Moreover, FCC's tax returns for the years covered by the thru-put agreement show that the only income received by FCC during this time period was rental income. These tax returns do not show any income for aggregate thru-putting, nor do they include any expenses for employee wages, equipment rental or maintenance, or fuel expenditures necessary to carry out its obligations under the CAL thru-put agreement. On the other hand, WEC's income statements and tax returns reveal that WEC deducted the expenses incurred in conjunction with aggregate thru-putting and received income for the thru-put of aggregate in amounts that correspond to the amounts generated by the CAL thru-put agreement.

Although FCC has gone into great detail to attempt to provide evidence of a material fact issue, proffered rationales that receipt of income by WEC and the failure to declare any thru-put income by FCC were merely the result of inter-company adjustments are not sufficient to overcome the overwhelming evidence of an assignment. Indeed, FCC's own accountants testified that such debiting and crediting could not have occurred between these two parties since FCC files separate tax returns from the tax returns of WEC and other related companies. Furthermore, the same accountants testified that even if such funds had, in fact, been debited and credited between these two companies, the income would first have appeared on the company actually earning it, which in this case was WEC. As a final note, FCC has offered no documentary evidence supporting this accounting practice, such as documents memorializing such inter-company adjustments through debits and credits.

FCC's further contention that an assignment could not have occurred since FCC maintains a "receivable" for the thru-put agreement fails for similar reasons. If the thru-put income were truly a receivable of FCC, this income would have appeared on FCC's tax returns as income received from the thru-put agreement. As FCC's accountants testified, the party earning the income declares it as

such, and had FCC received any income under the thru-put agreement, it would have appeared on FCC's tax returns.

FCC's next contention refuting the existence of an assignment in this case is the allegation that the absence of income on FCC's tax returns is a result of other parties' involvement in the transaction. FCC contends that other parties were involved in the transaction whose names did not appear on the agreement, at the request of CAL. This attempt to introduce evidence of other entities as parties to the agreement is an impermissible attempt to vary unambiguous terms of the written contract.[3] Furthermore, the agreement contains a merger clause which forecloses such a position.[4]

FCC next argues that no assignment can be found in this case since there is no written assignment document or any other document indicating an intent to assign. However, an assignment can be inferred from the totality of the circumstances and need not be reduced to writing.[5] In addition, Georgia courts may look to tax returns as probative evidence in ascertaining the existence of an assignment.[6] The affirmative decision to declare the thru-put income on the tax returns of WEC and not on the tax returns of FCC is certainly evidence of an intent to assign. Moreover, FCC's vice-president testified that oral agreements between FCC and WEC were entered into under his direction and supervision, showing yet another intent to assign. The trial court properly found that FCC had assigned the CAL thru-put agreement to WEC.

2. FCC next contends that even if an assignment occurred, it does not amount to a material breach of the agreement and thus should not foreclose recovery by FCC on the CAL agreement. As support for this contention, FCC maintains that the fundamental purpose of the agreement — to provide CAL with a place to discharge and store its aggregate cargo — was satisfied in this case. Thus, according to FCC's contentions, any breach of the nonassignability clause cannot be considered a material breach of the agreement. We disagree.

Under Georgia law, a party's refusal to abide by a contract provision prohibiting assignment, or any other relinquishing of contractual obligations, is properly considered a repudiation of the contract

---

[3] See OCGA § 13-2-2 (1); *First Data POS v. Willis*, 273 Ga. 792, 794 (1) (546 SE2d 781) (2001).

[4] See *First Data POS*, supra at 795 (2).

[5] See generally *Empire Distrib. v. George L. Smith II Ga. &c. Auth.*, 235 Ga. App. 742, 746 (509 SE2d 650) (1998) (the circumstances surrounding a transaction may be considered in determining the scope and effect of the agreement between the parties); *CareAmerica v. Southern Care Corp.*, 229 Ga. App. 878, 882 (1) (494 SE2d 720) (1997) (considering the circumstances surrounding the assignment).

[6] *Carter v. Davenport*, 175 Ga. App. 830 (334 SE2d 876) (1985).

amounting to an anticipatory breach.[7] Such a repudiation of the agreement estops FCC from seeking to enforce other provisions of the agreement. Since the assignment of the contract extinguished FCC's right to performance and constituted an anticipatory breach of the contract, the issue of materiality is irrelevant. We, nonetheless, considered the materiality argument raised by FCC and found that the assignment by FCC is clearly a material breach of the contract.

FCC's breach of contract claim stems from its refusal to accept CAL's proposed assignment of the agreement to Martin Marietta. We find it ironic, as did the trial court, that FCC argues the nonassignability clause is not a material aspect of the CAL agreement, especially in light of FCC's own refusal of CAL's request for consent to an assignment of the agreement to Martin Marietta. This refusal shows that FCC thought the identity of the parties to the agreement was important or it would have accepted CAL's proposed assignment. In addition, the agreement creates a bailment relationship between FCC and CAL, wherein CAL entrusts aggregate to FCC's safekeeping. Certainly, the uniqueness and identity of the parties are material terms in such a relationship, and the trial court did not err in determining that FCC's assignment was a material breach of the CAL thru-put agreement.

3. FCC asserts that even if an assignment occurred and the assignment is considered a material breach of the CAL agreement, CAL waived any objection to such an assignment because it knew that FCC was one of a group of related companies performing various functions at the facility, yet failed to object. In support of this contention, FCC attempts to introduce parol evidence to the CAL agreement. However, the CAL agreement contains a merger clause. The purpose of merger clauses is to preclude any unilateral modifications of a written contract through evidence of pre-existing terms which were not incorporated into the written contract.[8] Moreover, where parties have reduced to writing a complete and certain agreement, the court will, in the absence of fraud, mistake, or accident, conclusively presume that the writing contains the entire contract, and parol evidence of prior or contemporaneous representations or statements is inadmissible to add to, take from, or vary a written contract.[9] The trial court did not err in finding that CAL did not waive its right to object to the assignment.

*Judgment affirmed. Blackburn, C. J., and Miller, J., concur.*

---

[7] *Stevenson v. Allen*, 94 Ga. App. 123, 125 (93 SE2d 794) (1956).

[8] See *Thomas v. Garrett*, 265 Ga. 395, 396 (1) (456 SE2d 573) (1995).

[9] See *Andrews v. Skinner*, 158 Ga. App. 229, 231 (279 SE2d 523) (1981).

DECIDED APRIL 11, 2002 —
RECONSIDERATION DENIED MAY 3, 2002 — 

*Bouhan, Williams & Levy, Roy E. Paul, Walter C. Hartridge, David M. Conner,* for appellant.

*Hunter, Maclean, Exley & Dunn, Robert S. Glenn, Jr., Colin A. McRae,* for appellees.