A02A2169. BROGDON v. PRO FUTURES BRIDGE CAPITAL FUND, L.P.

(580 SE2d 303)

RUFFIN, Presiding Judge.

Pro Futures Bridge Capital Fund, L.P. ("Pro Futures") sued Chris Brogdon, Chief Executive Officer ("CEO") of NewCare Health Corporation ("NewCare"), for breach of contract. Pro Futures alleged that Brogdon failed to honor a contract to repurchase stock in NewCare ("Put Agreement"), which Pro Futures obtained through a subscription agreement ("Subscription"). Pro Futures moved for summary judgment, and the trial court granted the motion. Brogdon appeals, asserting that the trial court erred in (1) failing to integrate the Put Agreement with the Subscription; (2) finding that Pro Futures had complied with the Subscription; and (3) concluding that Pro Futures complied with applicable securities regulations. Because Brogdon's allegations of error lack merit, we affirm.

A trial court properly grants summary judgment "when there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."[1] We conduct a de novo review of a grant of

---

[1] *White v. BDO Seidman, LLP*, 249 Ga. App. 668, 669 (549 SE2d 490) (2001).

summary judgment.[2] So viewed, the record demonstrates that New-Care sought to raise investment capital through Pro Futures. James Perry, a Pro Futures partner, met with NewCare representatives including Brogdon, who, in addition to being the CEO of NewCare, was also a stockholder in the company. In his affidavit, Perry stated that he "was reluctant to invest in NewCare" because the deal did not fit into Pro Futures' normal parameters for investing. According to Perry, Brogdon proposed the Put Agreement to "induce" Pro Futures to invest.

The Put Agreement specified that "Pro Futures is considering an investment of at least $2 million in NewCare's Private Offering and Brogdon is personally willing to grant certain rights to Pro Futures in order to encourage it to invest in the Private Offering." The Put Agreement then provided that "[a]t any time during the one year period commencing on the date of this Agreement, Pro Futures may put to Brogdon all or any portion of the [stock] which it purchases in the Private Offering. . . . This right may be exercised one time only during the one year period." Brogdon and Perry signed this agreement on January 22, 1998.

The same day, Pro Futures and NewCare entered into the Subscription agreement in which Pro Futures subscribed to purchase significant stock in NewCare. Under the terms of the Subscription, Pro Futures represented that it was acquiring the stock for investment purposes and not for resale. The contract further provided that the stock consisted of " 'restricted securities' as defined [by federal law], and must be held for a minimum of one year following purchase, and thereafter may be sold in only limited amounts in a specified manner in accordance" with federal law.

On January 11, 1999, Pro Futures notified Brogdon that it was exercising its rights under the Put Agreement and demanded that Brogdon repurchase the stock. When Brogdon failed to repurchase the stock, Pro Futures filed suit, asserting that Brogdon was in breach of the Put Agreement. Thereafter, Pro Futures moved for summary judgment. Following a hearing on the matter, the trial court granted the motion. The trial court found that the Put Agreement did "not by its own terms or by implication incorporate the terms of . . . the Subscription" and did not violate securities law. Brogdon appeals this order.

1. Brogdon argues that the trial court erred in failing to integrate the Put Agreement with the Subscription because the two documents were executed as part of the same transaction. Brogdon asserts that, "[a]t a minimum, there is an issue of fact as to whether

---

[2] See id.

the two agreements were intended to be separate or interrelated." And, if the documents are interrelated, Brogdon maintains that he can require Pro Futures to adhere to the Subscription prior to meeting his obligations under the Put Agreement.

"An issue of contract construction is at the outset a question of law for the court."[3] The court first looks to the four corners of the agreement to ascertain the meaning of the contract from the language employed.[4] "The intent of the parties governs as the cardinal rule of construction."[5] Another rule of construction "is to consider the background of the contract and the circumstances under which it was entered into, particularly the purpose for the particular language to be construed."[6] We consider these rules along with the general principle that

> the law does not permit the construction of an agreement which will give one party the right to destroy it by a simple refusal to comply with it, unless the terms of the contract are so clear and unambiguous as to make irresistible the conclusion that no other result could possibly be reached, and that such was the intention of the parties.[7]

In applying these rules, we conclude that the Subscription and Put Agreement do not constitute a single contract. Given the fact that the two documents were executed the same day and that one contract served as consideration for the other, we agree that the two agreements relate.[8] However, it does not necessarily follow that the two agreements should be read as one contract.

As this Court has noted, "[i]n cases of contemporaneous agreements *between the same parties with relation to the same subject matter*, each writing may be used to ascertain the true intention of [the] parties and may authorize a determination that, when construed together, they constitute, as a whole, but one contract."[9] Here, the two agreements were not between the same parties, as Brogdon signed the Put Agreement in his individual capacity, whereas he executed the Subscription on behalf of NewCare. Accordingly, it does not

---

[3] (Punctuation omitted.) *Barrow County Airport Auth. v. Romanair, Inc.*, 254 Ga. App. 722, 724 (2) (563 SE2d 467) (2002).

[4] See id.

[5] *Fontaine v. Sidelines IV, Inc.*, 245 Ga. App. 681, 683 (1) (538 SE2d 137) (2000).

[6] (Punctuation omitted.) *Horwitz v. Weil*, 275 Ga. 467, 468 (569 SE2d 515) (2002).

[7] Id. at 469.

[8] See *CareAmerica, Inc. v. Southern Care Corp.*, 229 Ga. App. 878, 880 (1) (494 SE2d 720) (1997).

[9] (Punctuation omitted; emphasis in original.) *Moran v. NAV Svcs.*, 189 Ga. App. 825, 826 (1) (377 SE2d 909) (1989).

appear that we can construe the two agreements as one.[10] Furthermore, in using the language of the contracts to ascertain the intent of the parties, it is abundantly clear that the parties intended Brogdon, personally, to protect Pro Futures' investment in NewCare for a period of one year. In exchange, Pro Futures would invest in Brogdon's company. Thus, the documents, although related, embody separate obligations. And the fact that the Subscription contains an integration clause subverts Brogdon's argument that it should be read as part and parcel of the Put Agreement.

Moreover, if the two agreements are construed as a single contract, such construction would undermine Pro Futures' rights under the Put Agreement. We will not read the Subscription in connection with the Put Agreement so as to render the latter obligation illusory.[11] To permit the possible destruction of the Put Agreement would be a particularly anomalous result given that the Subscription never would have existed but for the Put Agreement. Under these circumstances, the trial court did not err in considering the two documents as separate agreements.[12]

2. In a related argument, Brogdon contends there is an ambiguity that requires jury resolution. The ambiguity comes from reading the Put Agreement in connection with the Subscription, as the two contracts have contradictory sale provisions. Whereas the Put Agreement required Brogdon to repurchase the stock within one year of its purchase, the Subscription precluded Pro Futures from selling the stock within a year of its purchase.

Assuming, for the sake of argument, that the Subscription creates an ambiguity in the Put Agreement, it does not require jury resolution. Again, "[t]he intent of the parties governs as the cardinal rule of construction."[13] For the reasons stated in Division 1, the contractual language makes clear that the two contracts are separate, and we will not read them together in order to create an artificial ambiguity.

3. In his final enumeration of error, Brogdon argues that the trial court erred in concluding that Pro Futures complied with federal securities law "in its attempted sale of securities to Brogdon." Brogdon cites the federal Securities Act, which he contends restricts the sale of unregistered stocks, such as those held by Pro Futures.[14] Under Brogdon's characterization of the transaction, the sale of stock under the Put Agreement would be virtually impossible without run-

---

[10] See id.

[11] See *Horwitz*, supra.

[12] See *Gale Indus. v. O'Hearn*, 257 Ga. App. 220, 221-222 (1) (570 SE2d 661) (2002).

[13] *Fontaine*, supra.

[14] See Securities Act of 1933, § 4 (1), 15 USC § 77a et seq.

ning afoul of the securities law. Pro Futures, on the other hand, asserts that the transfer of stock was permissible under the relevant statutes.

We need not address the application of securities law in this case, which is analogous to *Hullender v. Acts II*.[15] In *Hullender*, a husband and wife were the sole stockholders in a corporation. When the couple divorced, they entered into an agreement in which the wife transferred her stock to the corporation in return for a personal guaranty from the husband. When the corporation defaulted, the wife sought payment from the husband, who tried to avoid payment on the grounds that the underlying agreement was void ab initio under Georgia law.

In concluding that the husband could not avoid liability on his personal guaranty, this Court noted,

> [t]he contract here made is an effort on the part of Mr. Hullender to individually guarantee the debenture note evincing the illegal repurchase agreement. Can Mr. Hullender as sole stockholder of the corporation and party to the repurchase contract say, when sued for its performance, "the contract is unenforceable as it was wrong for us to make it," and thereby deny liability thereunder[?] It would be false logic to hold that Mr. Hullender could avoid liability under the contract for the reason that the making of it was an illegal act to the detriment of third persons. If there is a wrong or if any harm has been committed, let those who have been injured complain, and not those who have made the wrong a possibility.[16]

We applied the same rule in *Morris & Manning Ins. Agency v. Morris*.[17] In that case, shareholders structured a stock purchase in such a way to render void the personal guaranty that was executed in connection with the purchase. Again, this Court held that the shareholders could not avoid their obligations under the guaranty by claiming that the agreement violated the law in some respect.[18]

Here, Brogdon conceived the Put Agreement, which is essentially a personal guaranty, to induce Pro Futures to invest in NewCare. Brogdon, as CEO of NewCare and a stockholder in the company, benefitted from the transaction. Accordingly, he cannot avoid his obligation under the Put Agreement by claiming that its enforce-

---

[15] 153 Ga. App. 119 (264 SE2d 486) (1980).
[16] (Punctuation omitted.) Id. at 121 (2).
[17] 211 Ga. App. 433 (439 SE2d 660) (1993).
[18] See id. at 436 (1).

ment violates federal securities law.[19] For these reasons, the trial court did not err in granting Pro Futures' motion for summary judgment.

*Judgment affirmed. Adams, J., concurs. Barnes, J., concurs in the judgment only.*

DECIDED MARCH 25, 2003.

*Duane Morris, Charles W. Whitney, Timothy J. McGaughey,* for appellant.

*McKenna, Long & Aldridge, Gary W. Marsh, Lawrence A. Slovensky,* for appellee.