**In the Matter of CHIPMAN–UNION, INC., Debtor.**

**Watson Insurance Agency, Inc., Plaintiff,**

**v.**

**Chipman–Union, Inc., Defendant.**

**Bankruptcy No. 01–31418 RFH.**
**Adversary No. 04–3008.**

United States Bankruptcy Court, M.D. Georgia, Athens Division.

Feb. 17, 2005.

James C. Morton, Atlanta, GA, for Plaintiff.

G. Frank Nason, IV, Atlanta, GA, for Defendant.

## *MEMORANDUM OPINION*

ROBERT F. HERSHNER, JR., Chief Judge.

Watson Insurance Agency, Inc., Plaintiff, and Chipman–Union, Inc., Defendant, filed cross-motions for summary judgment on November 19, 2004. The Court, having considered the record, the Statement of Agreed Upon Material Facts, the affidavit, and the arguments of counsel, now publishes this memorandum opinion.

The material facts are not in dispute. Plaintiff is an insurance broker. Plaintiff procures insurance coverage for its clients. Defendant was a textile manufacturer. Plaintiff was employed by Defendant to procure its property, workers' compensation, automobile, and liability insurance. Plaintiff procured the insurance from Pennsylvania Manufacturers' Association Insurance Company ("PMA"). The policies were issued for one-year terms which began on April 1 of each year. The policies covered Defendant's property and operations located in Georgia and in other states. The policies provided in part that Defendant's rights and duties under the policies could not be transferred without PMA's written consent.

Plaintiff, as part of its duties, recommended appropriate insurance coverage, procured insurance proposals from insurers, communicated and coordinated coverage changes, and was directly and continuously involved in all aspects of the quotation, billing, and payment of premiums.

■ Historically, and during the relevant period, premiums were paid as follows: Plaintiff sent an invoice each month to Defendant. Defendant sent its payment to Plaintiff. PMA sent an invoice each month to Plaintiff. Plaintiff sent its payment to PMA. Thus, Defendant sent payment to Plaintiff, which in turn sent payment to PMA. Plaintiff sent payment to PMA regardless of whether Defendant had sent payment to Plaintiff.[1]

Defendant's insurance policies came up for renewal on April 1, 2001. The premiums on the policies were "estimates" subject to adjustment at the end of the policy term. Prior to April 2001, Plaintiff knew that Defendant would be reducing the size of its operations. As Defendant reduced its operations, Plaintiff requested that PMA eliminate coverage and immediately reduce premiums for the remainder of the 2001–2002 policy year. PMA advised Plaintiff that it would not eliminate cover-

---

1. This practice is known as "agency billing." In contrast, in "direct billing" the insured is billed by and pays premiums directly to the insurance company. *W.A. Lang Co. v. Anderberg–Lund Printing Co. (In re Anderberg–Lund Printing Co.),* 109 F.3d 1343, 1344–45 (8th Cir.1997). *See also Sutter Insurance Co. v. Applied Systems, Inc.,* 393 F.3d 722, 723 (7th Cir.2004); *HRH of Connecticut, Inc. v. M & M Oil, LLC,* 2002 WL 31875281 (Conn.Super., Dec.2, 2002).

age or reduce premiums midterm. PMA advised that it would process a premium refund after the policy term ended if its post-term audit of Defendant's operations showed that the coverage during the term was less than originally estimated. The post-term audit would occur after April 1, 2002.

The insurance policies provide that premium refunds would be paid to the "named insured." Defendant was the "named insured."

Gray Sanders is a senior broker and a manager for Plaintiff. Mr. Sanders had principal responsibility for providing insurance brokerage services to Defendant. Mr. Sanders, on Plaintiff's behalf, sent a letter dated June 6, 2001, to Henry Reynolds, Defendant's Chief Financial Officer. Plaintiff offered Defendant two options for revising its premium payment schedule. Both options required that Defendant immediately pay part of the current balance due. The letter stated in part:

> Any credits for return premiums for policy changes or audits will be paid directly to Watson Insurance [Plaintiff] and the remaining installments will be adjusted to reflect the reduced premium due.

Defendant accepted the "second payment option." Defendant paid Plaintiff $70,345 on June 17, 2001. Defendant paid Plaintiff $65,125 on July 13, 2001. Defendant made several monthly payments to Plaintiff.

Plaintiff offers the affidavit of Mr. Sanders. Mr. Sanders testified that a condition of the payment options was that any returned premiums would be paid directly to Plaintiff. Mr. Sanders testified that he would not have authorized Plaintiff to continue making payments to PMA in excess of the amounts Plaintiff received from Defendant without Defendant's assignment of the post-term return premiums. Mr. Sanders testified that he relied on Defendant's agreement that the return premiums would be paid to Plaintiff in refraining from cancelling Defendant's polices.

An involuntary petition under Chapter 7 of the Bankruptcy Code was filed against Defendant on October 15, 2001. Defendant exercised its right to convert the Chapter 7 case to a Chapter 11 case. Defendant has ceased operations, liquidated its assets, and will not reorganize as a going concern.

Plaintiff paid PMA $89,417 in excess of the amounts that Defendant paid to Plaintiff. Plaintiff paid $12,398.40 of the $89,417 after the bankruptcy filing. Defendant concedes that Plaintiff has an allowed administrative expense claim for $12,398.40.

PMA audited Defendant's operations and determined that it owed, for purposes of this adversary proceeding, a net premium refund of $89,417.[2] This is the amount that Plaintiff paid to PMA in excess of the amount that Defendant paid to Plaintiff. PMA is holding in trust the $89,417 pending further order of the Court.

Plaintiff filed on February 4, 2004, its Complaint for Declaratory Judgment. Plaintiff filed an amended complaint on June 7, 2004. Defendant filed a response and an amended response. Both Plaintiff and Defendant assert entitlement to the $89,417.

■ Federal law determines whether an interest is property of the bankruptcy estate. The nature and existence of the interest is determined by state law. *Witko*

---

2. The "gross premium refund" was $159,110. PMA asserted a right of recoupment or setoff for $18,072.77. Defendant received $51,620.23 of the "gross premium refund." The net premium refund at issue is the remaining $89,417.

v. Menotte (In re Witko), 374 F.3d 1040, 1043 (11th Cir.2004).

■ The insurance polices do not contain choice of law provisions. Plaintiff relies upon Georgia law. Defendant does not cite any foreign state law. The Court will apply Georgia law to the issues presented. See Continental Technical Services, Inc. v. Rockwell International Corp., 927 F.2d 1198, 1199 (11th Cir.1991) (federal court does not have to scour the law of a foreign state for possible arguments a party might have made.)

Plaintiff contends that Defendant assigned its rights to the $89,417 by accepting the "second payment option."

■ Property subject to a valid assignment does not become property of the bankruptcy estate. In re Flanders, 45 B.R. 222, 224 (Bankr.M.D.Ga.1984).

■ An assignment is an absolute, unconditional, and complete transfer of all rights, title, and interest in property. An assignment results in total relinquishment of any control over the property. Allianz Life Insurance Co. of North America v. Riedl, 264 Ga. 395, 444 S.E.2d 736, 738 (1994).

■ "[An] assignment can be inferred from the totality of the circumstances...." Forest Commodity Corp. v. Lone Star Industries, Inc., 255 Ga.App. 244, 564 S.E.2d 755, 758 (2002), cert denied.

■ "Any language, however informal, will be sufficient to constitute a legal assignment, if it shows the intention of the owner of the right to transfer it instantly, so that it will be the property of the transferee." First State Bank v. Hall Flooring Co., 103 Ga.App. 270, 118 S.E.2d 856, 857 (1961).

■ "An assignment is a contract and, in order to be valid, must possess the same requisites (parties, subject matter, mutual assent, consideration) as any other contract." Bank of Cave Spring v. Gold Kist, Inc., 173 Ga.App. 679, 327 S.E.2d 800, 802 (1985).

■ Assignments may be either legal or equitable. A legal assignment requires evidence of intent to assign or transfer a specific thing which is sufficiently described to make it capable of being identified. An equitable assignment is a transfer of a present interest that for one reason or another does not amount to a legal assignment. Bank of Cave Spring, 327 S.E.2d at 802.

■ Turning to the case at bar, Plaintiff sent a letter that offered Defendant two options for revising its premium payment schedule. Defendant accepted the "second payment option" and made a number of payments to Plaintiff. The letter stated that "Any credits for return premiums for policy changes or audits will be paid directly to [Plaintiff]...." Plaintiff would not have continued making payments to PMA in excess of the amounts that Plaintiff received from Defendant without Defendant's assignment of the post-term return premiums. Plaintiff relied on Defendant's assignment in refraining from canceling Defendant's insurance policies. The Court can only conclude that Defendant assigned its rights in the return premiums to Plaintiff.

Defendant argues that it could not assign its rights because the policies contain non-assignment clauses. Georgia law provides that an insurance "policy may be assignable or non-assignable, as provided by its terms." O.C.G.A. § 33–24–17 (1996).

■ A contract, other than one for personal service, is generally assignable even though the contract contains a non-assignment clause. A contract may not be

assigned when the non-assignment clause was inserted to protect a party from a material reduction in the value of the contract. *Singer Asset Finance Co. v. CGU Life Insurance Co. of America,* 275 Ga. 328, 567 S.E.2d 9, 10 (2002).

In *Imperial Enterprises, Inc. v. Fireman's Fund Insurance Co.,*[3] Fireman's Fund issued fire insurance policies to Carpet Mills, Inc. A year later, Carpet Mills and Imperial Enterprises were merged. Imperial Enterprises was the surviving corporation. Carpet Mills' assets, including the fire insurance policies, were transferred to Imperial Enterprises by operation of law. A fire occurred at a manufacturing plant. Fireman's Fund denied the claim because of the alleged wrongful assignment without its consent.

The Fifth Circuit Court of Appeals noted that non-assignment clauses in insurance policies are expressly permitted under Georgia law. However, Georgia courts do not apply non-assignment clauses to avoid insurance coverage when the assignment was involuntary or by operation of law. "The reason is a very pragmatic one: such transfers do not entail any increase in the risk or hazard assumed by the insurer." 535 F.2d at 290–91.

The circuit court stated in part:

Like the *National American [Ins. Co. v. Jamison Agency, Inc.]* court, see 501 F.2d [1125] at 1130 n. 1 [(8th Cir.1974)], we choose not to rest our decisions solely on the fact that this transfer occurred by operation of law. *Rather, it is the complete lack of any alteration in the insured-against risks or hazards in this particular transfer that we find to be the most compelling reason for not applying the no-assignment clause in this case.*

535 F.2d at 292, n. 9. (emphasis added).

■ Turning to the case at bar, the Court is not persuaded that the non-assignment clauses prevented Defendant from assigning its rights in the return premiums. The assignment does not increase the risks or hazards assumed by PMA. The assignment does not cause a material reduction in value to PMA. PMA has not filed an action seeking to assert the non-assignment clauses. The Court is not persuaded that Defendant can assert the non-assignment clauses as a defense to its own assignment.

Defendant also argues that "an agreement to pay in the future from a particular source does not constitute an assignment."[4] *See In re Flanders,* 45 B.R. at 224. Defendant relies upon *Hanes v. Crown Camera Sales, Inc.*[5] In that case the debtor had a contract to provide television lighting for basketball games at a coliseum. The debtor arranged to purchase the lighting fixtures from Crown Camera. The debtor sent a letter to Crown Camera that stated in part: "It is agreed that the contract monies received from [the lighting job] will be put in full for payment for these fixtures and lamps." The debtor received payment for the lighting job and paid its account with Crown Camera.

The bankruptcy trustee sought to avoid as preferential the debtor's payments to Crown Camera. Crown Camera contended that the debtor's letter

---

**3.** 535 F.2d 287 (5th Cir.1976). Decisions by the Fifth Circuit handed down prior to October 1, 1981 are binding precedent on this Court. *Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

**4.** Brief in Support of Defendant Chipman–Union, Inc.'s Renewed and Restated Motion for Summary Judgment, p. 9, (filed Nov. 19, 2004), Docket No. 25.

**5.** 468 F.2d 1318 (5th Cir.1972).

was an assignment of the proceeds of the debtor's contract for the lighting job. The Fifth Circuit Court of Appeals disagreed noting that there was no indication of a present surrender of control or an immediate transfer of ownership of the contract monies. The circuit court stated in part:

> On the contrary, the language shows that [the debtor] intended itself to receive the contract monies from the [lighting job] and then apply such monies as payment for the fixtures and lamps purchased from defendant. It is undisputed that this is exactly what happened. The court concludes that the September 11th letter did not create a legal assignment.

468 F.2d at 1320–21.

The Court notes that in *Hanes*, the monies were paid to the debtor which in turn paid Crown Camera. In the case at bar, any credits for return premiums were to be paid directly to Plaintiff under its assignment. The Court is persuaded that, in the case at bar, there was a present surrender of control or transfer of ownership of the return premiums.

The Court has also considered *King v. Gilbert*.[6] In that case the debtor had assigned its tax refund to the defendants. The bankruptcy trustee argued that he was entitled to the tax refund. The Fifth Circuit Court of Appeals ruled against the trustee and stated, in part:

> The appellant [trustee] claims that under Georgia law the tax refund could not be assigned because it was not property in existence at the time of the assignment. That is an incomplete statement of the law of Georgia. In an equity proceeding, such as bankruptcy, the as-

signment of a contingent right will be enforced. When the contingency is realized, the right to the property attaches as of the time of the assignment.

569 F.2d at 398–99.

Finally, Defendant relies upon *General Insurance Co. of America v. Anderberg–Lund Printing Co. (In re Anderberg–Lund Printing Co.)*[7] and *Virginia Block Co. v. Virginia Mutual Insurance Agency, Inc. (In re Virginia Block Co.)*.[8] In those cases, the bankruptcy courts held that the debtors were entitled to the unearned premium refunds. The Court notes that in the cases cited the debtors had not assigned the refunds to their insurance brokers. The Court is not persuaded that the cases cited by Defendant are applicable to the case at bar.

The Court is persuaded that Plaintiff is entitled to the net premium refund of $89,417.

An order in accordance with this memorandum opinion shall be entered this date.

---

**6.** 569 F.2d 398 (5th Cir.1978).

**7.** 1994 WL 692953 (Bankr.D.Minn., Dec.9, 1994).

**8.** 16 B.R. 771 (Bankr.W.D.Va.1982).